

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 6, 2014**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 13-31182-BJH |
| ROBERT MARC EDELMAN, | § | (Chapter 11) |
| | § | |
| DEBTOR. | § | |
| | § | |
| ———————————————— | § | |
| | § | |
| DREXEL HIGHLANDER LIMITED PARTNERSHIP, DGP, LLC, and R. GLENN WIGGINS, | § | ADV. PROC. NO. 13-03078-BJH |
| | § | |
| | § | (Consolidated with |
| | § | Adv. Proc. No. 13-03126-BJH) |
| PLAINTIFFS, | § | |
| v. | § | |
| | § | |
| ROBERT MARC EDELMAN AND DIANA EDELMAN, | § | |
| | § | |
| | § | |
| DEFENDANTS. | § | |

### <u>MEMORANDUM OPINION</u>

The Court held a trial in this consolidated adversary proceeding on March 10-11, 2014. At the conclusion of the trial, the Court directed briefing on several issues raised at trial. The last of the post-trial briefs was submitted on March 24, 2014, following which the Court took the matter under advisement. This Memorandum Opinion contains the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

## I.    JURISDICTION; VENUE; STATUTORY AND CONSTITUTIONAL AUTHORITY

The U.S. District Court for the Northern District of Texas has subject matter jurisdiction over this proceeding under to 28 U.S.C. § 1334. Although bankruptcy courts do not have independent subject matter jurisdiction over bankruptcy cases and proceedings, 28 U.S.C. § 151 grants bankruptcy courts the power to exercise certain "authority conferred" upon the district courts by title 28. Under 28 U.S.C. § 157, the district courts may refer bankruptcy cases and proceedings to the bankruptcy courts for either entry of a final judgment (core proceedings) or proposed findings and conclusions (noncore, related-to proceedings). So, as relevant here, this Court exercises authority over Edelman's underlying Chapter 11 bankruptcy case and this adversary proceeding pursuant to the Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc adopted in this district on August 3, 1984 (the "**Standing Order of Reference**"). Venue is proper with this Court under 28 U.S.C. § 1409.

The Plaintiffs ask this Court to liquidate their claims against the Edelman bankruptcy estate, as reflected in the Plaintiffs' Amended Petition [Dkt. No. 54], and then determine whether any resulting judgment is dischargeable in bankruptcy. Accordingly, this Court has statutory authority to hear and finally determine this core proceeding under 28 U.S.C. § 157(b)(2)(B), (I), and (O). The Court's determination of its authority to hear this proceeding, however, does not end here.

In *Stern v. Marshall,* 131 S. Ct. 2594 (2011), the U.S. Supreme Court held that, notwithstanding the bankruptcy court's statutory authority under 28 U.S.C. § 157(b)(2)(C) to adjudicate an estate's counterclaim against a creditor, the bankruptcy court lacked constitutional authority to enter a final judgment on the state-law counterclaim because such claim would "not [be] resolved in the process of ruling on a creditor's proof of claim." *Id.* at 2620; *see also BP RE, L.P. v. RML Waxahachie Dodge, L.L.C., et al.,* 735 F.3d 279, 286 (5th Cir. 2013) ("Thus, 'Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.'") (citing *Stern*, 131 S. Ct. at 2618); *Frazin v. Haynes & Boone, LLP (In re Frazin),* 732 F.3d 313, 317-20 (5th Cir. 2013) (concluding that two of three counterclaims would necessarily be resolved in bankruptcy court's award of attorneys' fees and were therefore within the bankruptcy court's constitutional authority under *Stern*).

Here, the Plaintiffs are each a creditor of the Edelman estate who timely filed a Proof of Claim that attaches a copy of Plaintiffs' Amended Petition to it. *See* Northern District of Texas Claims Register, Case No. 13-31183-BJH-11, Claim No. 4-1 filed by Drexel Highlander Limited Partnership, Claim No. 5-1 filed by DGP, LLC, and Claim No. 6-1 filed by R. Glenn Wiggins (individually, a "**Proof of Claim**" and, collectively, the "**Proofs of Claim**").[1]  Although the Plaintiffs' claims (other than those related to dischargeability) are all based upon state law, resolving these state-law claims is necessary to adjudicate both this adversary and the allowability of the claims asserted in the Proofs of Claim.  "Such claims by creditors against debtors are the very reason the claims allowance process exists." *The Cadle Co. v. Moore (In re*

---

[1] As of the date of this Memorandum Opinion, no party has objected to the Proofs of Claim.

**MEMORANDUM OPINION**                                                                                              **3**

*Moore*), 739 F.3d 724, 728 (5th Cir. 2014);[2] *see, e.g., Jacobsen v. Sramek*, 2013 WL 694045, at *4 (E.D. Tex. Feb. 26, 2013) (holding in the context of a dischargeability proceeding that "[p]ursuant to *In re Morrison*, [555 F.3d 473, 479 (5th Cir. 2009)], the bankruptcy court had the authority to liquidate the Srameks' allowed claim before entering final judgment even though the merits of the claim would need to be determined by application of state law."); *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 312–13 (Bankr. N.D. Tex. 2011) ("*Stern* does not hold, directly or indirectly, that an Article I tribunal is without Constitutional authority to liquidate a creditor's claim against a debtor through entry of a final dollar judgment and then determine whether that judgment is dischargeable in the debtor's bankruptcy case.").

Finally, as recently explained by the Seventh Circuit in *Wellness International Network, Ltd. v. Sharif*, 727 F.3d 751 (7th Cir. 2013):

> [W]hether to grant or deny discharge is central to the restructuring of the debtor-creditor relationship. Although it is debatable whether such restructuring falls under the rubric of public rights, *see Stern*, 131 S. Ct. at 2614 n.7; *Granfinanciera,* 492 U.S. at 56 n.11, 109 S. Ct. 2782; *but cf. N. Pipeline*, 458 U.S. at 71, 102 S. Ct. 2858 (plurality opinion) ("[T]he restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages.... The former may well be a 'public right,' but the latter obviously is not."), it is clear that WIN's objections to discharge differ

---

[2] Prepetition, Cadle sued Moore and other parties in state court asserting fraudulent transfers, constructive trust, and reverse-piercing of the corporate veil. *Id.* at 726. Moore subsequently filed for bankruptcy, and Cadle removed the action to the district court, which referred the matter to the bankruptcy court. *Id.* Cadle alleged that the bankruptcy court lacked constitutional authority to enter a final judgment under *Stern* because the avoidance action originated from and was based entirely upon state law and was wholly independent of the bankruptcy proceeding. *Id.* at 728. The Fifth Circuit held that:

> The bankruptcy court had authority to enter final judgment because Cadle's state-law claims "would necessarily be resolved in the claims allowance process." *Id.* [*Stern*] at 2618. In *Stern*, the trustee asserted counterclaims to augment the estate apart from the bankruptcy proceeding. Here, Cadle is a creditor who has filed a proof of claim for debts owed by the debtor, and resolving the state-law claim is necessary to adjudicating its proof of claim. Such claims by creditors against debtors are the very reason the claims allowance process exists. *Cf. In re Frazin*, 732 F.3d at 320–24 (concluding that two of three counterclaims would necessarily be resolved in bankruptcy court's award of attorneys' fees and were therefore within court's constitutional authority under *Stern* ).

*Id.* at 728.

markedly from the state-law claims at issue in *Stern*, *Granfinanciera*, *Northern Pipeline*, and *Ortiz*.  The Supreme Court has not come close to holding that an Article III judge must decide claims for which the Bankruptcy Code itself provides the rule of decision, and we will not do so here, where the parties concede that the bankruptcy judge had authority.

*Id.* at 773.  Thus, this Court concludes that it has the constitutional authority to both liquidate the Plaintiffs' state-law claims and to determine whether any resulting judgment is dischargeable in the debtor's bankruptcy case.

## II.    FACTUAL AND PROCEDURAL HISTORY

This adversary proceeding arises from the prepetition business relationship between Plaintiff R. Glenn Wiggins ("**Wiggins**") and debtor Robert Marc Edelman ("**Edelman**"). Edelman and Wiggins directly and indirectly owned and/or managed various companies that collectively planned, constructed, operated, and ultimately leased or sold multi-family housing units.  As discussed in more detail in Section II.B, below, the business entities relevant to this proceeding are plaintiff Drexel Highlander Limited Partnership ("**DHLP**"), who owned the condominium complex at issue here (the "**Drexel Highlander**"), plaintiff DGP, LLC ("**DGP**"), who was DHLP's general partner, and non-party Drexel Development Company, LLC ("**DDC**"), who served as a construction management company for the condominium project.  Wiggins, who had no significant prior real estate experience, provided financial support and personal guarantees to the project, while Edelman, who had prior real estate experience, managed the project on a day-to-day basis.

The parties' business relationship began to materially deteriorate in the fall of 2010 when Wiggins learned of allegations of improper dealings against Edelman in relation to a project that was separate from the Drexel Highlander and subject to a different ownership structure.  Wiggins inquired whether it was true that Edelman had put up several hundred thousand dollars to settle the allegations, which struck Wiggins as contrary to Edelman's alleged prior statements that he

had no money.  In relation to this conversation, Edelman disclosed that approximately $400,000 had been transferred from DDC, a company Edelman jointly owned with Wiggins, to the separate project to satisfy real estate taxes.  When Edelman inquired whether that amount would be repaid to DDC, Edelman answered no, the other project had no ability to repay DDC. Wiggins then retained counsel and took steps to remove Edelman from his position of control over the companies.

### A.    The Consolidated Adversary Proceeding

DHLP, DGP, and Wiggins (the "**Plaintiffs**") filed suit against Edelman and his wife Diana Edelman ("**Diana**")[3] on May 10, 2011 in the District Court of Dallas County, Texas 162nd Judicial District, commencing Case No. DC-411-00769-1 (the "**State Court Lawsuit**").[4]  The Plaintiffs, either individually or collectively, asserted various state-law claims against Edelman, including: (1) trespass, (2) breach of fiduciary duty, (3) violation of the Texas Theft Liability Act, (4) common law fraud, (5) fraud by nondisclosure, (6) breach of contract, and (7) conversion.  JPTO[5] at ¶ 32.  The Plaintiffs also sought to recover exemplary damages on their claims, as well as reasonable attorneys' fees and costs.  *Id.* at 4, ¶ 9 (Plaintiffs' Contentions).

On March 4, 2013, shortly before the commencement of trial on the State Court Lawsuit, Edelman filed for protection under Chapter 11 of the Bankruptcy Code in this Court.  *See In re Robert Marc Edelman*, Bankr. Case No. 13-31182-BJH-11, Dkt. No. 1.  The Plaintiffs then removed the State Court Lawsuit to the U.S. District Court for the Northern District of Texas,

---

[3] On the eve of trial, the parties filed an agreed motion [Dkt. No. 116] requesting that the claims against Diana be severed and remanded to the State Court.  This Court granted the remand motion on March 13, 2013 [Dkt. No. 117]. Accordingly, no claims asserted against Diana are addressed in this Memorandum Opinion.

[4] Edelman asserted various counterclaims against the Plaintiffs in the State Court Lawsuit; however, Edelman either withdrew those counterclaims during trial or failed to introduce evidence in support of them.

[5] Unless otherwise indicated, citations to "JPTO" refer to Section II (titled "Stipulated Facts") of the Joint Pretrial Order [Dkt. No. 113] entered into by the parties and signed by the Court.

which referred it to this Court pursuant to the Standing Order of Reference.  The State Court Lawsuit is pending in this Court as Adversary Proceeding No. 13-3078-BJH (the "**Removed Lawsuit**").

On June 3, 2013, the Plaintiffs filed their Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a),[6] requesting that this Court find that any judgment entered against Edelman in the Removed Lawsuit is nondischargeable in his bankruptcy case under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and/or (a)(6).  JPTO at ¶¶ 44-45.  Plaintiffs have also requested a declaratory judgment allowing their claims in the Removed Lawsuit.  *Id.* at ¶ 46.  On October 28, 2013, upon motion of all parties, this Court consolidated the dischargeability proceeding and the Removed Lawsuit.  *Id.* at ¶ 47.

As noted previously, trial of the consolidated adversary proceeding began on March 10, 2014, at which time the parties stipulated that consideration of the Plaintiffs' claims for attorneys' fees and costs would be bifurcated from the rest of the Plaintiffs' claims, and would be considered following the issuance of the Court's decision on the balance of their claims.  After the close of the evidence at trial, the Plaintiffs withdrew their claims for (1) breach of contract (Wiggins v. Edelman), (2) conversion (DHLP and DGP v. Edelman), and (3) common law fraud (all Plaintiffs v. Edelman).  Thus, this Memorandum Opinion addresses the Plaintiffs' remaining claims for (1) trespass, (2) breach of fiduciary duty, (3) violation of the Texas Theft Liability Act, and (4) fraud by nondisclosure, along with their request for exemplary damages.  This Memorandum Opinion then addresses the dischargeability of any resulting judgment.

---

[6] Commencing Adversary Proceeding No. 13-3126-BJH.

B.      The Drexel Entities

1.      Drexel Highlander Limited Partnership

DHLP is a Texas limited partnership formed in 2004 to develop the Drexel Highlander, a 48-unit, luxury condominium complex located at 4240 Prescott Avenue in Dallas, Texas.  JPTO at ¶¶ 1, 6, 12, and 13.  Wiggins and Edelman each directly or indirectly own limited partnership interests in DHLP.  *Id.* at ¶¶ 55-56.

Pursuant to its partnership agreement, the management and control of DHLP's business and its affairs rests exclusively with its general partner, DGP.  Agreement of Limited Partnership of Drexel Highlander Limited Partnership (the "**DHLP Partnership Agreement**") [Plaintiffs' Ex. 4] at § 7.1(a) (Management of the Partnership).  As discussed in more detail below, Edelman was the individual designated by DGP to carry out its duties and responsibilities to DHLP.

DHLP and Valliance Bank of McKinney, Texas ("**Valliance**") were parties to a Commercial Loan Agreement, dated effective March 5, 2008, under which Valliance agreed to loan $9,402,270 to DHLP.  Commercial Loan Agreement [Plaintiffs' Ex. 14] at 1; JPTO at ¶ 16.  As testified to by Rex Yarborough, the former CEO of Valliance, the Commercial Loan Agreement was entered into by DHLP after construction of the Drexel Highlander was complete, and portions of the Valliance loan were used to pay off the prior construction loan between DHLP and the construction lender (First United Bank of Oklahoma).  As testified to by both Wiggins and Gary Caughey ("**Caughey**"), an in-house accountant employed first by DDC then by DGP, unsold condominium units at the Drexel Highlander served as Valliance's collateral,[7] and net sale proceeds of Drexel Highlander condominium units were used to pay down the Valliance loan.  JPTO at ¶ 61; Commercial Loan Agreement [Plaintiffs' Ex. 14] at 1.

---

[7] Wiggins testified that he also personally guaranteed the Valliance loan.

At trial, Wiggins testified that, by the time he removed Edelman from authority, the Valliance loan had been drawn to the point that DHLP could not service the loan. Further, Wiggins testified that DHLP's assets had been reduced by the sale of condominium units, but the Valliance loan had not been correspondingly reduced due, in part, to the payment of illegal commissions on the sale of those units to Diana. Thus, DHLP subsequently defaulted on the loan, and Valliance foreclosed on the Drexel Highlander on June 5, 2012. JPTO at ¶ 19.

## 2.    DGP, LLC

DGP, the general partner of DHLP, is a limited liability company organized under the laws of the State of Texas. JPTO at ¶ 8. DGP was organized in 2001, with Wiggins as the sole member. *Id.* at ¶ 52; Regulations of DGP, LLC [Plaintiffs' Ex. 1] at Schedule A. On April 20, 2006, a Certificate of Resolution was executed by Edelman and Wiggins as "managers" of DGP appointing Edelman as Vice President of DGP:

> RESOLVED, that Robert Edelman ("Designed Officer") is the Vice President of the LLC [DGP] and is authorized to act for the LLC, in its capacity as general partner of the Partnership [DHLP]; and
>
> RESOLVED, that the Designated Officer is authorized for, in the name of, and on behalf of the LLC, in its capacity as general partner of the Partnership, to negotiate the terms and conditions of the sale of the Property [Drexel Highlander] as the Designated Officer deems best and is authorized to execute, attest, acknowledge, and deliver such agreements as may be necessary to carry out the sale of said Property, and to consummate such sale by executing and delivering a deed or deeds to the Property, and any other documents as may be necessary or desirable to consummate the sale of the Property, for and in behalf of the LLC, in its capacity as general partner of the Partnership; and
>
> RESOLVED, that the Designated Officer is hereby authorized and directed to do all other acts and things as may be required to carry out, perform, and give effect to the terms and provisions of these resolutions and the aforesaid documents for and in behalf of the LLC, in its capacity as general partner of the Partnership[.]

Certificate of Resolution [Plaintiffs' Ex. 5] at 1.

From April 20, 2006 through mid-November 2010, Edelman acted as Vice President of DGP and, in that capacity, exercised complete control over the day-to-day management of DGP and DHLP.  *See* § III.B.1.a, *infra*.  On November 17, 2010, however, the Plaintiffs advised Edelman that his authority to act on behalf of DGP and DHLP had been revoked and, on November 22, 2010, DGP executed resolutions removing Edelman as an officer and manager of DGP.  JPTO at ¶¶ 25, 26; Letter from T. Kurth of Haynes and Boone, LLP to Edelman dated November 17, 2010 [Plaintiffs' Ex. 19]; Written Consent of the Sole Manager of DGP, LLC [Plaintiffs' Ex. 20] at 1.  On November 24, 2010, DHLP filed a Notification of Authority in the real property records of Dallas County, Texas that provides, in relevant part, that (1) all actions of DHLP may only be effected through DGP, and (2) DGP's officers and only authorized representatives are Wiggins, as President, and his daughter Jennifer Killion ("**Killion**"), as Secretary and Treasurer.  JPTO at ¶ 27; Notification of Authority [Plaintiffs' Ex. 77] at 1.  After November 2010, Edelman had no authority to act for or on behalf of either DGP or DHLP.  JPTO at ¶ 28.

### 3.    Drexel Development Company, LLC

DDC is a Texas limited liability company formed in 2000.  JPTO at ¶ 14; Regulations of Drexel Development Company, LLC [Plaintiffs' Ex. 147].  Edelman and Wiggins are the sole members of DDC, with each holding a 50% interest in the company.  JPTO at ¶ 15.

DDC and DHLP were parties to a Development Agreement – Highlander Project, Dallas, Texas (the "**Development Agreement**"), dated April 12, 2004, pursuant to which DDC provided DHLP with "comprehensive development and construction management services" regarding the Drexel Highlander.  Development Agreement [Plaintiffs' Ex. 165] at 1.

On October 22, 2007, a depository account ending in x1570 was opened at Valliance in DDC's name (the "**DDC Deposit Account**"). Commercial Signature Card [Plaintiffs' Ex. 75] at 1. Edelman, Diana, and Caughey are listed as the sole "authorized signers" on this account. *Id.*; JPTO at ¶ 18.

Beginning in November 2008 and continuing through December 2009, over $2,510,000 was drawn under the DHLP Commercial Loan Agreement and deposited into the DDC Deposit Account (the "**Disputed Draws**"). Table of Loan Advances and supporting documents [Plaintiffs' Ex. 174] at 1;[8] Draw Requests [Defendant's Ex. 21-54]. As testified to by both Edelman and Caughey, the Disputed Draws were booked by each company as a loan to DDC from DHLP, despite the fact that Edelman did not initially agree with Caughey's classification of the funds as a loan. Caughey testified that Edelman eventually agreed with him, and the books of both companies reflect the Disputed Draws as a loan from DHLP to DDC, although there is no promissory note, collateral, or repayment terms related to the "loan." Edelman testified that once the Disputed Draws were deposited into the DDC Deposit Account, he considered the funds to be DDC's property.

Each request for a Disputed Draw was made on DDC letterhead and signed by Caughey, purportedly on behalf of DHLP. Plaintiffs' Ex. 174; Defendant's Exs. 21-54. Caughey's unrefuted testimony, though, was that he was never employed by, or authorized to act on behalf of, DHLP. Instead, Caughey worked for DDC and reported to Edelman at the relevant times, and the draw letters were submitted to Valliance at Edelman's request. Further, each draw request expressly directs that the funds drawn be deposited into the DDC Deposit Account,

---

[8] As Killion testified, $2,510,000 is the aggregate sum of all amounts reflected on the draw requests at Plaintiffs' Exhibit 174 that were deposited into the DDC Deposit Account (Acct. x1570). This amount does not include funds allocated to interest payments on the Valliance loan, amounts drawn but paid on account of DHLP expenses (such as real property taxes), and a $5,000 draw request deposited directly into a DHLP deposit account.

despite the express provisions of (1) the Commercial Loan Agreement requiring that all borrowings be funded to DHLP, (2) the DHLP Partnership Agreement requiring that all partnership funds be deposited in its name, and (3) the Development Agreement that requires that funds received on behalf of DHLP be deposited into a segregated account and not be comingled. *See* Draw Requests [Plaintiffs' Ex. 174]; Commercial Loan Agreement [Plaintiffs' Ex. 14] at § VI(c); DHLP Partnership Agreement [Plaintiffs' Ex. 4] at §9.1 (Partnership Funds); Development Agreement [Plaintiffs' Ex. 165] at § 8(a) (Procedure for Handling Receipts).

Initially, these draws generally ranged between $25,000 and $100,000. Table of Loan Advances and supporting documentation [Plaintiffs' Ex. 174]. However, the last three draws, requested in November and December 2009, were in the amount of $500,000 each. *Id.* Edelman testified that the Commercial Loan Agreement was maturing and that he feared, in light of market conditions at that time, that the participating banks would not renew the loan. Thus, in his business judgment, Edelman believed that it was in the best interests of DHLP to draw the full amount available under the Commercial Loan Agreement. While that makes some sense, it assumes that the drawn funds would be held by DHLP and used for DHLP-approved purposes, including, if necessary, repayment of the Valliance loan.

While DDC was receiving the Disputed Draws from Valliance, DDC's other income streams were dwindling and it was operating at a significant net loss. *See* DDC Financial Statements [Plaintiffs' Ex. 10] at RE-001219 (showing negative net income for 2008 of $694,044) and [Plaintiffs' Ex. 11] at RE-000973 (showing negative net income for 2009 of $1,348,113).

## C.     The Edelmans' Use of DHLP's Funds and Property

As reflected in Defendants' Exhibits 21-54 (Draw Requests), a total of over $3.7 million was drawn at DDC's request under the DHLP Commercial Loan Agreement between April 2, 2008 and January 31, 2011,[9] allocated approximately as follows: (1) the Disputed Draws ($2,510,000) deposited into the DDC Deposit Account, (2) $218,173 deposited into an account with Valliance in DHLP's name, (3) $716,225 in interest payments on the Valliance loan, (4) $225,000 deposited into the DDC Deposit Account but to be used for payment of DHLP taxes per the draw request, and (5) $82,873 deposited into the DDC Deposit Account but excluded from Plaintiffs $2,510,000 calculation for an unknown reason.  Of the various draws, only the Disputed Draws are at issue here.

Overall, as alleged by the Plaintiffs in their Exhibit 149,[10] in the years 2008 through 2010, the Edelmans received total compensation and benefits from DHLP of $2,014,257.31, comprised of (1) $1,484,397.49 in payments to the Edelmans for contract labor and commissions, (2) $195,324.48 in market-value rent for the Edelmans' occupancy of Drexel Highlander Unit 2F, (3) $34,394.35 paid on the Edelmans' behalf for their personal dry cleaning expenses, and (4) $300,140.99 paid on the Edelmans' behalf for their personal expenses charged to the DDC American Express ("**AMEX**") cards held in their names.  An in-depth review of this exhibit and its underlying documentation, however, shows that the Plaintiffs' figure is partially incorrect.  The Court will address each category of expenses in turn, and then provide a chart comparing its calculation to that reflected on Plaintiffs' Exhibit 149.

---

[9] Draws under the DHLP Commercial Loan Agreement that were deposited into the DDC Deposit Account only occurred between November 4, 2008 and December 14, 2009.  *See* Defendant's Exhibits 25 – 43.  Amounts requested before and after that time frame were for interest payments on the Valliance loan that, according to Caughey, were not true "draws," but instead were handled as book entries internally by Valliance.

[10] Plaintiffs' Exhibit 149 is a summary of voluminous Plaintiffs' Exhibits 10-13, 18, 150, and 156.

First, the record shows that all contract labor payments at issue were made from the DDC Deposit Account.  *See* DDC Paid Invoice Register [Plaintiffs' Exhibit 13].  The DDC Deposit Account, however, held funds *prior* to deposit of the first Disputed Draw in November 2008. *See* DDC Financial Statements [Plaintiffs' Ex. 10] at RE-001218 (showing $475,964 of cash as of December 31, 2008), Draw Request dated November 4, 2008 [Plaintiffs' Ex. 174(1)] (reflecting the first Disputed Draw that was deposited into the DDC Deposit Account).  There is nothing in the record indicating that DHLP was the source of the pre-November 4, 2008 funds held in the DDC Deposit Account.  Thus, although post-November 4, 2008 cash payments could have been paid from DHLP funds (via the Disputed Draws), the pre-November 4th payments could not.  Accordingly, the Plaintiffs' calculation on Exhibit 149 improperly includes contract labor payments made from the DDC Deposit Account between January 1, 2008 and November 3, 2008, when there is no evidence in the record establishing that these payments were made from DHLP funds.

Commissions, however, are not subject to this same time limitation because they were paid from proceeds generated from the sales of condominium units at the Drexel Highlander and, as such, are not limited by the time of the first Disputed Draw.  Unfortunately, the Plaintiffs' pleadings are less than clear regarding the relevant timeframe in which they believe that commission-related damages should be calculated.  For example, the Plaintiffs' Amended Petition [Dkt. No. 54] does not appear to be limited to any particular time frame, and the Plaintiffs' voluminous exhibits permit the Court to calculate commission-related damages going back as far as 2006.  In the JPTO, however, the parties appear to limit the relevant timeframe to transactions that occurred between January 1, 2008 and December 31, 2010.  JPTO at 20, ¶ 17(c).  Further, the evidence and arguments at trial were limited to the 2008 through 2010 time

period, so damages arising prior to 2008 were not tried by consent.  Because the JPTO governs the scope of this proceeding, the Court will limit its analysis regarding commission-related damages to the period of January 1, 2008 through December 31, 2010.  *See, e.g., Arsement v. Spinnaker Exploration Co., LLC*, 400 F.3d 238, 245 (5th Cir. 2005) (pretrial order controls scope and course of trial; claim or issue not included in pretrial order is waived unless presented at trial without objection).

Second, although DHLP suffered damages when the Edelmans occupied Unit 2F for 56 months without paying rent, these damages are excluded from the Court's calculation reflected below because the occupancy did not result in a cash payment made to Edelman or for his direct or indirect benefit from DHLP funds.  These damages will be calculated and discussed separately in the Court's analysis of trespass (*see* § III.A, *infra*) and breach of fiduciary duties (*see* § III.B.2.b)(1), *infra*).

Third, Plaintiffs' Exhibit 149 is overstated by including dry cleaning charges, as it was Diana's unrefuted testimony that the dry cleaning expenses were for cleaning uniforms worn by individuals working at the Drexel Highlander, such as the concierge and housekeeping staff, not the Edelmans' personal dry cleaning charges.

Fourth, Plaintiffs' Exhibit 149 overstates payments made in 2008 to AMEX for Edelman's direct or indirect benefit.  As with contract labor payments, payments to AMEX on account of the Edelmans' personal expenses could not have been made with DHLP funds prior to the first Disputed Draw being deposited into the DDC Deposit Account.  Accordingly, the 2008 AMEX payments must be limited to payments made after November 4, 2008.  This can be done by tracing the relevant payments through the Plaintiffs' exhibits, as explained below.

The AMEX invoices are found at Plaintiffs' Exhibit 156.  The November 2008 invoice has a closing date of November 11, 2008 and reflects charges made between October 10, 2008 and November 11, 2008, totaling $27,980.83 for all users.  AMEX Invoices [Plaintiffs' Ex. 156] at RE-AMEX-000537.  Of this amount, $479.50 was charged by Edelman and $13,166.69 was charged by Diana.  *Id.*  As reflected on Plaintiffs' Exhibit 13, this invoice was paid in full.  Paid Invoice Register [Plaintiffs' Ex. 13] at DHLP-000516.  Similarly, the December 2008 invoice has a closing date of December 11, 2008 and reflects charges made between November 11, 2008 and December 11, 2008, totaling $31,010.50 for all users.  AMEX Invoices [Plaintiffs' Ex. 156] at RE-AMEX-000551.  Of this amount, $1,294.32 was charged by Edelman and $16,445.67 was charged by Diana.  As reflected on Plaintiffs' Exhibit 13, this invoice was paid in full.  Paid Invoice Register [Plaintiffs' Ex. 13] at DHLP-000516.  Finally, Plaintiffs' Exhibit 173 is a summary of AMEX charges found in Plaintiffs' Exhibits 150 and 156.  Killion's unrefuted testimony was that Exhibit 173 reflects payments made to AMEX for Edelman's direct or indirect benefit.  Exhibit 173 also details the alleged personal charges by date.  When the Court limits the payments made to AMEX to the November and December 2008 invoices, total payments made to AMEX for Edelman's direct or indirect benefit total $29,556.34.[11]

A comparison of the Court's calculation and Plaintiffs' Exhibit 149, follows:

---

[11] While this matter was under advisement, the Court inquired of the parties whether an electronic version of Exhibit 173 was available, which it was.  Once it was determined that Edelman's counsel did not object, each of the Court and Edelmans' counsel were provided with the electronic copy, which the Court was able to sort by date and charge to calculate its figure.

**MEMORANDUM OPINION**                                                                                              **16**

| Edelman Compensation: | 1/01/08 - 11/03/08 | 11/04/08 - 12/31/08 | 2009 | 2010 | Total |
|---|---|---|---|---|---|
| Contract Labor, Commissions, Bonuses: | $176,052.44[12] | ~~$654,434.04~~<br>$186,396.32[13] | ~~$484,142.69~~<br>$483,501.48[14] | $345,820.43[15] | ~~$1,484,397.49~~<br>$1,191,770.67 |
| FMV of Housing at Drexel Highlander: | n/a | ~~$65,108.16~~<br>$0 | ~~$65,108.16~~<br>$0 | ~~$65,108.16~~<br>$0 | ~~$195,324.48~~<br>$0 |
| Dry Cleaning: | n/a | ~~$15,771.60~~<br>$0 | ~~$11,996.97~~<br>$0 | ~~$6,625.78~~<br>$0 | ~~$34,394.35~~<br>$0 |
| American Express: | n/a | ~~$183,911.54~~<br>$29,556.34 | $74,502.05 | $47,727.40 | ~~$300,140.99~~<br>$151,785.79 |
| **Total:** | **$176,052.44** | **~~$919,225.34~~**<br>**$215,952.66** | **~~$635,749.87~~**<br>**$558,003.53** | **~~$459,282.10~~**<br>**$393,547.83** | **~~$2,014,257.31~~**<br>**$1,343,556.46** |

A brief explanation of the nature of the contract labor payments, commissions, housing, and other benefits paid to Edelman or to or for his direct or indirect benefit follows.

    **1.    Contract Labor and Commissions Paid to Edelman or for His Direct or Indirect Benefit**

Caughey, DDC's in-house accountant, testified at trial that neither Diana nor Edelman were employees of DDC. However, Killion, a CPA who currently serves as DGP's secretary and treasurer and previously as an in-house accountant for DDC, testified that Edelman received monthly payments from DDC in the amount of $20,833 and that Diana received fluctuating monthly payments from DDC that were approximately $8,333 per month, all of such payments

---

[12] This figure reflects only commissions paid to Diana on the sale of DHLP condominium units between January 1, 2008 and November 3, 2008. As discussed above, contract labor payments made prior to the first Disputed Draw are not included in the Court's calculation since the evidence does not establish that they were paid with DHLP's funds.

[13] Calculated as follows: (1) Diana - $16,666.66 in contract labor payments and $128,063.00 in commissions, and (2) Edelman - $41,666.66 in contract labor payments.

[14] Calculated as follows: (1) Diana - $99,999.96 in contract labor payments and $133,501.56 in commissions, and (2) Edelman - $249,999.96 in contract labor payments.

[15] Calculated as follows: (1) Diana - $91,666.30 in contract labor payments and $24,987.50 in commissions, and (2) Edelman – $229,166.63 in contract labor payments.

being coded by DDC as "contract labor." *See* DDC Paid Invoice Register [Plaintiffs' Ex. 13, beginning at RE-000699]. Despite paying the Edelmans these amounts as "contract labor," Caughey testified that DDC did not issue a Form 1099 to either Diana or Edelman. In addition to the recurring monthly amounts paid by DDC to the Edelmans, Diana also received commissions on the sales of units at the Drexel Highlander, despite the undisputed fact that she was not a licensed real estate broker or salesperson. Testimony of Caughey, Killion, and Diana, JPTO at ¶ 5. Edelman did not produce any contracts or other documents establishing either his or Diana's right to receive monthly compensation from DDC, nor did he produce a document or other evidence establishing Diana's right to receive commissions on the sales of condominium units at the Drexel Highlander.

## 2. The Edelmans' Occupancy of Drexel Highlander Unit 2F

From January 2007 to September 2011, the Edelmans occupied Unit 2F in the Drexel Highlander. JPTO at ¶ 21. During that time, the Drexel Highlander was owned by DHLP. *Id.* at ¶ 22. DHLP paid the utility bills for Unit 2F during the time the Edelmans resided in Unit 2F, as it did for all unsold units. *Id.* at ¶¶ 24, 60.

On February 18, 2011, DHLP served a Notice to Vacate on the Edelmans, demanding that the Edelmans vacate Unit 2F before 12:01 a.m. on February 25, 2011. *See* Notice to Vacate [Plaintiffs' Ex. 28]. The Edelmans failed to vacate Unit 2F, and DHLP initiated eviction proceedings. On May 4, 2011, the Justice Court, Precinct 5, Place 1, Dallas County, Texas entered its Final Judgment in favor of DHLP against the Edelmans, awarding DHLP exclusive possession of Unit 2F. Final Judgment [Plaintiffs' Ex. 29] at 1. The Edelmans appealed the judgment, but the parties ultimately settled the matter and the Edelmans vacated Unit 2F in September 2011. *See* Rule 11 Agreement [Plaintiffs' Ex. 31] at ¶ 13.

### 3.    AMEX Bills Paid for Edelman's Direct and Indirect Benefit

At trial, Killion gave detailed testimony based upon her review of DDC's books and records regarding personal expenses incurred by the Edelmans on the DCC AMEX cards issued to them that were subsequently paid by DDC.  Plaintiffs' Exhibit 173 is a summary of Plaintiffs' Exhibits 150 and 156, which are both comprised of voluminous corporate AMEX invoices and related receipts.   Killion testified that, during 2008 through 2010, the Edelmans incurred $300,140.99 of personal charges on the DCC AMEX cards issued to them and that DDC then paid those charges.

In response, Diana testified that some of the amounts Killion complained of were not the Edelmans' personal expenses but were DHLP-related business expenses, such as taking real estate brokers to dinner to discuss the Drexel Highlander or to provide hors d'oeuvres in model units.  However, Diana did not specifically identify the charges that were business related or even quantify by dollar amount the business-related charges.  Neither did Edelman, either in his trial testimony or in his post-trial brief.

Thus, while the Court recognizes that some of what appear to be personal charges may be DHLP-related business expenses, it has no ability to quantify what the amount of the business-related expenses are based upon the trial record.

## III.    LEGAL ANALYSIS

As noted previously, after withdrawing three claims following the close of evidence at trial, one or more of the Plaintiffs now seek a monetary judgment against Edelman under the following theories: (1) trespass, (2) breach of fiduciary duty, (3) violation of the Texas Theft Liability Act, and (4) fraud by nondisclosure.  The Plaintiffs also seek to recover exemplary damages where appropriate, along with their reasonable attorneys' fees, although the attorneys'

fee issue has been bifurcated for later determination. Finally, the Plaintiffs seek a determination that the amounts owed to them, together with any other damages and attorneys' fees ultimately awarded to them, are nondischargeable under 11 U.S.C. §§ 523(a)(2), (a)(4), and/or (a)(6).

Thus, the Court will first determine if the Plaintiffs are entitled to a judgment against Edelman. If any Plaintiff is so entitled, the Court will next consider whether any or all of such judgment is nondischargeable in Edelman's bankruptcy case. Each claim will be separately addressed below.

### A. Trespass (DHLP v. Edelman)

To prevail and recover damages on its trespass claim, DHLP must prove that: (1) DHLP owned or had a lawful right to possess Unit 2F, (2) Edelman entered Unit 2F and the entry was physical, intentional, and voluntary, and (3) Edelman's trespass injured DHLP. *See Wilen v. Falkenstein*, 191 S.W.3d 791, 798 (Tex. App. -- Ft. Worth 2006, pet denied).

It is undisputed that from January 2007 to September 2011 the Edelmans occupied Unit 2F in the Drexel Highlander while the unit was owned by DHLP. Wiggins testified that he was fully aware that the Edelmans were occupying Unit 2F, but he believed that their occupancy was pursuant to a written lease. Although both Diana and Edelman testified that their occupancy of Unit 2F was pursuant to a long-term written lease, with monthly rent of $200 per month, the Edelmans were unable to produce the lease at trial.[16] DHLP also elicited testimony from Killion,

---

[16] Edelman offered a purported lease covering Unit 2F into evidence at trial; however, DHLP objected to admission of the lease on authenticity grounds because the copyright date on the bottom of the first page of the lease post-dated the alleged signing date of the lease and the copyright date on the remaining pages by several years. Diana testified that the first page of the lease had been lost and was recreated in the form of the offered exhibit. Under Federal Rule of Evidence 1002, an original writing is required in order to prove its contents, unless the Federal Rules of Evidence or a federal statute provides otherwise. Moreover, Federal Rule of Evidence 1003 states that a "duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity…." Here, there is a substantial question regarding the authenticity of the purported lease. Notably, all of the substantive lease terms, including lease rate and term, are set forth on page 1 of the lease, which was purportedly lost and recreated. Further, there is a dispute regarding whether Wiggins ever agreed to the terms now recited on the subsequently recreated first page. Federal Rule of Evidence 1004(a) states that an original is not required and other

who testified that she reviewed DHLP's books and records and could find no indication that the Edelmans had paid rent for the 56-month period that they occupied Unit 2F, and the Edelmans do not dispute that they failed to pay monthly rent while occupying Unit 2F (even at the rate of $200 per month).

In his closing argument, Edelman's counsel argued that Wiggins had consented to the Edelmans' occupancy of Unit 2F on behalf of DHLP. In his post-trial brief Edelman also argued that Wiggins, as the "person with apparent authority for DHLP to give consent," consented to the Edelmans' occupancy of Unit 2F. Defendant's Post-Trial Brief [Dkt. No. 120] at 8-9.

DHLP counters with the argument that, under both Texas and federal law, consent is an affirmative defense that must be affirmatively pleaded. Plaintiffs' Post-Trial Brief [Dkt. No. 119] at 5-6. According to DHLP, because Edelman raised this defense for the first time after the close of the evidence at trial, the defense was waived. *Id.*

Substantive state law determines what constitutes an affirmative defense. *Lucas v. U.S.,* 807 F.2d 414, 417 (5th Cir. 1986). "However, the Federal Rules of Civil Procedure provide the manner and time in which defenses are raised and when waiver occurs." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 610 (5th Cir. 2007) (internal quotation marks omitted). As the Fifth Circuit explained in *Arismendez*, a case removed to federal court under diversity jurisdiction, "Rule 8(c) of the Federal Rules of Civil Procedure 'requires that an affirmative defense be set forth in a defendant's responsive pleading. Failure to comply with this rule, usually results in a waiver.'" 493 F.3d at 610 (quoting *Lucas*, 807 F.2d at 417). "[A] defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an

---

evidence of the contents of a writing is admissible if the original is lost or destroyed and not by the proponent acting in bad faith. Edelman, though, provided no evidence of the circumstances surrounding how the first page of the lease was lost that would permit this Court to determine whether or not he was acting in bad faith. Accordingly, the Court sustained DHLP's objection to admission of the purported lease.

unexpected defense." *Rogers v. McDorman* 521 F.3d 381, 385 (5th Cir. 2008) (quoting *Ingraham v. U.S.*, 808 F.2d 1075, 1079 (5th Cir. 1987)). "Where the matter is raised in the trial court in a manner that does not result in unfair surprise, however, technical failure to comply precisely with Rule 8(c) is not fatal." *Arismendez*, 493 F.3d at 610 (citations omitted) (internal quotation marks omitted). "More specifically, a defendant does not waive an affirmative defense if it is raised at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond." *Id.* (citations omitted) (internal quotation marks omitted).

Actual or apparent consent is an affirmative defense to trespass under Texas law. *Stukes v. Bachmeyer,* 249 S.W.3d 461, 465 n.1 (Tex. App. -- Eastland 2007, no pet.); *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.*, 12 S.W.3d 827, 835 (Tex. App. -- Dallas 2000, no pet.). A review of Edelman's answer, pretrial brief, and proposed findings of fact and conclusions of law on file with this Court, however, show that he failed to plead or otherwise raise the affirmative defense of consent prior to trial. Original Answer and Counterclaim [Dkt. No. 42] at § 3 (Affirmative Defenses); Defendants' Proposed Findings of Fact and Conclusions of Law [Dkt. No. 31]; Defendants' Trial Brief [Dkt. No. 35]. Further, DHLP's alleged consent was not addressed in the Joint Pretrial Order governing this proceeding. *See, e.g., Arsement v. Spinnaker Exploration Co., LLC,* 400 F.3d 238, 245 (5th Cir. 2005) (pretrial order controls scope and course of trial; claim or issue not included in pretrial order is waived unless presented at trial without objection); *Valley Ranch Dev. Co., Ltd. v. FDIC,* 960 F.2d 550, 554 (5th Cir. 1992) (claim or issue omitted from pretrial order is waived).

Accordingly, the Court concludes that Edelman waived the affirmative defense of consent under Texas law by failing to adequately and timely raise the defense prior to trial. To permit Edelman to raise the defense now would result in unfair surprise and prejudice to DHLP.

With the consent issue now disposed of, the Court further concludes that DHLP has satisfied the first two elements of its trespass claim.  The fact that the Edelmans may have believed they had the right to live in Unit 2F is not a defense, as trespass may be found even if the defendant entered the property in good faith.  *See Trinity Univ. Ins. Co. v. Cowan*, 945 S.W.2d 819, 827 (Tex. 1997) ("The actor's subjective intent or awareness of the property's ownership is irrelevant.") (citing *Brannon v. Gulf States Energy Corp.*, 562 S.W.2d 219, 224 (Tex. 1977)).

In Plaintiffs' Trial Brief [Dkt. No. 29] DHLP argues that the Edelmans' trespass caused DHLP damages equal to (1) unpaid market-value rent during the 56 months the Edelmans occupied Unit 2F, plus the utilities paid by DHLP on Unit 2F for that period, (2) condominium fees DHLP was required to pay while the unit remained unsold, and (3) interest DHLP paid on the Valliance loan that would not have been paid had DHLP sold the unit and used the net proceeds to pay down the loan.[17]  DHLP, however, only provided persuasive evidence on its market-rate rent measure of damages.

Plaintiffs' Exhibit 18 is a copy of a lease between DHLP and a third party covering Drexel Highlander Unit 3A during approximately the same time-period.  Although there was conflicting testimony regarding the market comparability of the two units as far as views and noise levels, the Court finds the testimony regarding the units' comparability sufficient to establish the lease covering Unit 3A as relevant evidence of the market value of Unit 2F.  At trial, Killion testified that she took the monthly rent payable on Unit 3A ($4,500) and divided it

---

[17] DHLP provided no evidence at trial indicating that it would have been able to sell Unit 2F, and otherwise avoid paying the related interest on the Valliance loan, had the Edelmans not occupied Unit 2F.  Further, the parties stipulated that DHLP paid utilities on all unoccupied units.  JPTO at ¶ 24.  There is no evidence in the record indicating what DHLP was required to pay in utilities for Unit 2F based upon the Edelmans' occupancy versus what DHLP was required to pay on an otherwise vacant unit.  Finally, the record shows that DHLP was required to pay condominium fees on unsold units up to a certain occupancy rate.  There is nothing in the record indicating whether or not DHLP would have been required to pay condominium fees on Unit 2F had the Edelmans not occupied the unit.  Accordingly, these three potential measures of damages are not addressed further in this Memorandum Opinion or awarded to DHLP.

by that unit's square footage,[18] arriving at a rental value of $1.88 per square foot. Killion then multiplied the per-square-foot figure by the square footage of Unit 2F, to arrive at a rental value for Unit 2F of $5,400 per month.[19] Multiplying that figure by 56, the number of months the Edelmans occupied Unit 2F, Killion arrived at damages to DHLP of $302,400.

Although the Court found Diana's testimony that the fair market rental value of Unit 2F was lower than that testified to by Killion because the Edelmans would need to vacate the unit whenever it was sold to make sense, Diana never quantified what the alleged reduction in rental value should be.[20] Similarly, Edelman complains in his post-trial brief that, while the lease covering Unit 3A is "some evidence of leasehold value of Unit 3A," it would "not be reliable to use information from the only lease admitted into evidence to extrapolate that Unit 2F had a comparable rental value, without other information concerning the surrounding neighborhood, other type[s] of developments, the current (or then-current) fair market value of similar condominium units…., which did not occur at trial." Defendant's Post-Trial Brief [Dkt. No. 120] at 10. Edelman, however, provided no evidence on these points and, other than the Unit 3A

---

[18] The record does not reflect the square footage of Units 3A and 2F; however, no objection was lodged as to the mathematical accuracy of Killion's damage calculation.

[19] The Court notes that the Plaintiffs have alleged different amounts as the fair-market rental value of Unit 2F. In the JPTO, the Plaintiffs allege that "the fair market rental value of Unit 2F…was $5,000 per month." JPTO at 21, ¶ 24. At trial, however, Killion testified that the fair-market rental value for Unit 2F, based upon Unit 3A, was $5,400 per month. Although Edelman's counsel objected to use of Unit 3A as comparable, which goes to the weight the Court affords the evidence, he did not object to the evidence on the grounds it was outside the scope of the JPTO. Accordingly, Killion's testimony became an uncontested part of the trial record and may be considered by the Court. *See, e.g., Arsement v. Spinnaker Exploration Co., LLC,* 400 F.3d 238, 245 (5th Cir. 2005) (pretrial order controls scope and course of trial; claim or issue not included in pretrial order is waived unless presented at trial without objection).

[20] Moreover, the Edelmans provided conflicting testimony on this point. Edelman testified that the Edelmans entered into a long-term written lease with DHLP because he was experiencing health problems and he wanted to make sure that Diana was protected should something happen to him – *i.e.*, she could continue to live in Unit 2F pursuant to the terms of the written lease. On the other hand, Diana testified that the Edelmans were willing to vacate Unit 2F if asked; however, she also testified that the Edelmans continued to occupy the unit after receiving the Notice to Vacate because the Edelmans believed that Wiggins was being "unfair" in demanding that they vacate.

lease and Killion's testimony, there is no evidence in the record regarding the fair rental value of Unit 2F.

Based upon the credible evidence at trial, this Court finds that DHLP was damaged by Edelman's trespass in the amount of $302,400, the fair-market rental value of Unit 2F for the period of time the Edelmans occupied the unit. DHLP is entitled to a judgment in this amount.

DHLP also requests that this Court find that the Edelmans wrongfully possessed Unit 2F in bad faith and with malice, and award exemplary damages because the trespass was done with "specific intent…to cause substantial injury or harm." *Id.* at ¶ 6. To recover exemplary damages, the Plaintiffs must show, by clear and convincing evidence,[21] that the trespass was initiated or accomplished with a specific intent to cause substantial injury or harm to the claimant. TEX. CIV. PRAC. REM. CODE §§ 41.001(7), 41.003(a)(2). Further, exemplary damages awarded against a defendant may not exceed an amount equal to the greater of: "(1)(A) two times the amount of economic damages; plus (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or (2) $200,000." TEX. CIV. PRAC. & REM. CODE § 41.008(b).

The only credible evidence in the record to support a finding of specific intent to cause substantial injury or harm to DHLP is that the Edelmans refused to vacate Unit 2F after receiving the Notice to Vacate on February 18, 2011 because they believed that Wiggins was being "unfair" in demanding that they vacate. The testimony shows, though, that prior to receiving the Notice to Vacate, the Edelmans believed that they had the right to occupy Unit 2F, despite being unable to produce the allegedly lost lease at trial. As such, based upon the record before it, the Court does not find that the Edelmans' occupancy of Unit 2F prior to February 18, 2011 was

---

[21] "Clear and convincing" evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 41.001(2).

done with specific intent to cause substantial injury or harm.  The Court, however, does find that the Edelmans' continued occupancy of Unit 2F after receiving the Notice to Vacate through the time they finally left the premises in September 2011 was done with a specific intent to cause substantial injury to DHLP.  The Edelmans knew that they had no legal right to remain in Unit 2F after February 18th, but continued to do so for another seven months, forcing DHLP to resort to a legal process to evict them.

The economic damages associated with Edelman's wrongful, continued possession equal $37,800 ($5,400 x 7 months).  Based upon the record before it, the Court awards DHLP exemplary damages against Edelman of $75,000.

### B.    Breaches of Fiduciary Duty (DGP and DHLP v. Edelman)

To prevail and recover damages on their breach of fiduciary duty claims, DGP and DHLP must each show that: (1) Edelman had a fiduciary relationship with the entity, (2) Edelman breached his fiduciary duties to the entity, and (3) Edelman's breach resulted in injury to the entity or benefit to Edelman.  *See Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007); *In re ReoStar Energy Corp.,* 2012 WL 3184726, at *5 (N.D. Tex. Aug. 3, 2012). Intentional breach of fiduciary duty is a tort for which the Plaintiffs may recover exemplary damages.  TEX. CIV. PRAC. REM. CODE § 41.003.

In his post-trial brief, Edelman admitted that, as Vice President of DGP, he owed a fiduciary duty to DGP.  Defendant's Post-Trial Brief [Dkt. No. 120] at 11.  He also admits that DGP, as a general partner of DHLP, owes fiduciary duties to DHLP.  *Id.*  Edelman denies, however, that he owed a fiduciary duty to DHLP, of which he is neither an officer nor a general partner.  *Id.*  In fact, Edelman argues that not only is there no legal basis to find that a fiduciary duty exists, but that his functions as Vice President of DGP were expressly limited by the

Certificate of Resolution dated April 20, 2006 [Plaintiffs' Ex. 5],[22] which appointed him and allegedly limited his authority. Specifically, Edelman argues that his "role as vice president [of DGP] was limited to sales of condominium units at Drexel Highlander, and he was given authority to negotiate the sale, as well as execute documents on DHLP's behalf required to consummate the sale." *Id.* at 12.

### 1. Breach of Fiduciary Duty (DGP v. Edelman)

As stated immediately above, to prove its claim for breach of fiduciary duty, DGP must show that (1) Edelman owed it fiduciary duties (which Edelman admits), (2) Edelman breached those duties (which Edelman denies), and (3) Edelman's breach resulted in injury to DGP or benefit to Edelman at DGP's expense. For the reasons explained below, the Court concludes that DGP has failed to carry its burden of proof.

The Court notes that the alleged facts underlying DGP's claim for breach of fiduciary duty are the same facts underlying DHLP's claim. *Id.* at ¶ 52-58. As such, even assuming that DGP has satisfied the first two elements of its claim, it has failed to plead or prove any injury to it or benefit to Edelman independent of that claimed by DHLP. Indeed, a review of the Plaintiffs' Amended Petition and the JPTO shows that all relevant allegations are made conjunctively by DGP and DHLP, with the focus of those documents, as well as the trial record, being on injury caused to DHLP or benefit to Edelman at DHLP's expense.[23] In short, DGP failed to prove it suffered any damage from Edelman's breaches of fiduciary duty to it. Because of this, DGP's claim for breach of fiduciary duty fails.

---

[22] The relevant portions of the Certificate of Resolution may be found in Section II.B.2 *supra*, and will not be repeated here.

[23] For example, in Plaintiffs' Proposed Findings of Fact and Conclusions of Law [Dkt. No. 30], the Plaintiffs request that this Court enter a finding that "DHLP and DGP suffered at least $2,510,000.00 in actual damages that were proximately caused as a result of Robert Edelman's breach of fiduciary duties." *Id.* at ¶ 33.

2.      **Breach of Fiduciary Duty (DHLP v. Edelman)**

a)      **Edelman Owed a Fiduciary Duty to DHLP Via His Role as Vice President of DGP, DHLP's General Partner**

As noted previously, Edelman denies owing any fiduciary duty to DHLP.  The Court disagrees, as explained below.

The DHLP Partnership Agreement states that:

> [T]he management and control of the Partnership and its business and affairs shall rest exclusively with the General Partner [DGP], who shall have all the rights and powers which may be possessed by a general partner pursuant to the [Limited Partnership] Act, and such rights and powers as are otherwise conferred by law, or are necessary, advisable or convenient to the discharge of its duties under this Agreement and to the management of the business affairs of the Partnership.  The General Partner may designate one or more parties to act as agents to carry out its duties and responsibilities to the Partnership…..

DHLP Partnership Agreement [Plaintiffs' Ex. 4] at ¶ 7.1(a).  In turn, the Regulations of DGP, LLC provide:

> Officers.  The Managers may designate one or more individuals as officers of the Company [DGP], who shall have such titles and exercise and perform such powers and duties as shall be assigned to them from time to time by the Managers.

Regulations of DGP, LLC [Plaintiffs' Ex. 1] at § 10.1.B.

Edelman was appointed as Vice President of DGP on April 20, 2006 and, in such capacity, was "authorized to act for the LLC, in its capacity as general partner of the Partnership…."  Certificate of Resolution [Plaintiffs' Ex. 5] at 1-2.  Although the Certificate of Resolution also described the authority Edelman was granted to sell the Drexel Highlander condominium units, the Resolution placed no actual limits on Edelman's management of DGP and, in turn, DHLP.  *Id.*

Moreover, the evidence at trial conclusively established that Edelman controlled all aspects of DHLP's business operations during the relevant period.  For example, Edelman signed

the Commercial Loan Agreement in his capacity as Vice President of DGP, DHLP's general partner.  Commercial Loan Agreement [Plaintiffs' Ex. 14].  He also directed advances under the Commercial Loan Agreement.  Plaintiffs' Ex. 174; Testimony of Caughey.  At trial, Wiggins testified that Edelman was entrusted to manage the companies, including DHLP, on a day-to-day basis, and that Edelman's control over DHLP was "very tight."  Moreover, Caughey testified that, prior to November 2010, Edelman controlled the business affairs of the companies and that "Mr. Edelman direct[ed] everything."  As summarized in Plaintiffs' Exhibit 82, a November 12, 2010 email authored by Caughey and sent to Killion:

> Robert [Edelman] makes all decisions major or minor, approves or disapproves all expenditures, signs all checks except for weekly payroll, controls and filters the exchange of information including communications with third parties, controls and manages all banking functions and relationships, and maintains complete authority over all company personnel and activities.

Plaintiffs' Ex. 82, at 1 (fourth paragraph).

Brian Mantzey ("**Mantzey**"), the former Chief Credit Officer of Valliance who was familiar with DHLP's loan at Valliance, also testified that Edelman controlled DHLP.  In fact, Mantzey testified that the advances under the DHLP Commercial Loan Agreement were funded into the DDC Deposit Account because there was "common ownership and through the direction of the GP for Drexel Highlander LP."  When asked to identify who the general partner of DHLP was, Mantzey answered "Robert Edelman."  While this testimony showed that Mantzey did not fully understand the organizational structure of the entities, it also showed that he clearly believed that Edelman had full authority to act on behalf of DHLP and DDC.

Edelman argues, based upon various organizational documents that show that Wiggins was DGP's sole member and manager and held 50% of DDC's membership interests, that he did not have complete control over DGP and, in turn, DHLP.  Edelman further argues that Wiggins

had a superior right to manage DHLP, via Wiggins's sole ownership of its general partner, and merely chose not to do so and instead placed the burden upon Edelman.

While the Court agrees with Edelman on certain of these points, it remains convinced that Edelman exercised complete control over DHLP from April 2006 through November 2010. And while Wiggins had the right to control DGP and, in turn, DHLP, which right he exercised in November 2010 when he directed that Edelman be removed as the Vice President of DGP, the evidence establishes that Wiggins chose not to exercise his right to control and paid little attention to the day-to-day operations of the entities. Rather, Wiggins entrusted DHLP's day-to-day operations to Edelman through his appointment of Edelman as Vice President of DGP on April 20, 2006.

Under Fifth Circuit precedent, the type of control exercised by Edelman over DHLP, via his position as an officer of DGP, is sufficient to give rise to a fiduciary relationship with DHLP, regardless of whether Edelman was an officer or director of DHLP itself. *See FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 622 (5th Cir. 2011); *McBeth v. Carpenter*, 565 F.3d 171 (5th Cir. 2009); *LSP Inv. P'Ship v. Bennett (In re Bennett)*, 989 F.2d 779 (5th Cir. 1993); *In re Jones*, 445 B.R. 677, 708 (Bankr. N.D. Tex. 2011); *Crenshaw v. Swenson*, 611 S.W.2d 886, 890 (Tex. Civ. App. -- Austin 1980, writ ref'd n.r.e.). When determining whether a fiduciary duty exists in a multi-tiered management structure, such as the two-tier structure at hand, the Fifth Circuit has noted that "under Texas law, 'the issue of control has always been the critical fact looked to by the courts' in determining whether to impose fiduciary responsibilities on individuals whose actions directly determine the conduct of a general partner of a limited partnership." *In re Harwood*, 637 F.3d at 621 (quoting *In re Bennett*, 989 F.3d at 789).

For example, *Harwood* involved a two-tiered management structure similar to that at hand. In that case, the debtor (Harwood) admitted that as an officer of a corporation (B&W) he owed fiduciary duties to that corporation. *Id.* at 620. Harwood further admitted that the corporation (B&W), as the general partner of a limited partnership (FNFS), owed fiduciary duties to the limited partnership. *Id.* Harwood denied, however, that as an officer of B&W he owed a fiduciary duty to FNFS. *Id.* The evidence before the court, though, "establish[ed] that Harwood exercised near-complete control over both tiers of the entity until a few months prior to his termination." *Id.* at 623. Moreover, "although B&W as an entity was tasked with the management of FNFS pursuant to FNFS's partnership agreement, … the B&W board entrusted Harwood with the sole and plenary authority over the day-to-day management of the partnership enterprise." *Id.* The court did not find the facts that Harwood was not a majority shareholder of B&W and only one of several directors of B&W persuasive evidence that he did not exercise sufficient control over FNFS to establish a fiduciary relationship. *Id.* at 623 n.4. Ultimately, the Fifth Circuit held that the level of control exercised by Harwood was sufficient to cause him to owe fiduciary duties to FNFS.

Prior to its decision in *Harwood*, the Fifth Circuit addressed (in a non-bankruptcy context) the duties owed by an officer to a subsidiary entity that the officer controlled. *See McBeth v. Carpenter*, 565 F.3d 171 (5th Cir. 2009). In *McBeth*, the partnership agreement entrusted in the president (Carpenter) the "exclusive rights to manage all contracts and agreements" relating to the purchase and development of land, the purpose for which the partnership was created. *Id.* Indeed, Carpenter was described as "the man in control" and the one "heading the efforts" of the partnership, and acted as -- and held himself out to others as being -- the general partner of the partnership. *Id.* The court noted that, as a general principle,

"managing partners owe trust obligations to the partnership, having a duty of loyalty and due care as well as being under an obligation to discharge their duties in good faith and in the reasonable belief that they are acting in the best interest of the partnership." *Id*. at 177 (citing TEX. REV. CIV. STAT. ANN. art. 6132b, § 4.04(b)–(d)). The Fifth Circuit held that Carpenter's control over the direction of the partnership, via his position with the general partner, sufficed to make him a fiduciary of the partnership under Texas law. *Id*. at 178.

Similarly, in *In re Bennett*, 989 F.2d 779 (5th Cir. 1993)*,* the Fifth Circuit noted that the issue of first impression before it was whether "the scope of the fiduciary duty owed by the managing general partner of a limited partnership to the limited partners is sufficient to meet the narrow requirements of section 523(a)(4)." *Id.* at 783. If such a duty was sufficient under § 523(a)(4) of the Bankruptcy Code, the Fifth Circuit would have to decide if the same duty applied to "the managing partner of a managing partner." *Id*. After an extensive analysis of various cases, the Fifth Circuit first concluded that Texas law "clearly and expressly imposes trust obligations on managing partners of limited partnerships and these obligations are sufficient to meet the narrow requirements of section 523(a)(4)." *Id*. at 787 (citing primarily *Crenshaw*, 611 S.W.2d at 886). Moreover, the court held that the same level of fiduciary duty should be deemed to apply with regard to a managing partner of a managing partner, since the line of cases that hold that a managing partner of a partnership owes to the partners "the highest fiduciary obligations known at law," makes clear that the issue of "control" is "the critical fact looked to by the courts in imposing this high level of responsibility." *Id.* at 789. As a result, the Fifth Circuit determined that the debtor, as the managing partner of the managing partner, owed to the limited partners "the highest fiduciary duty recognized by law." *Id*. at 790.

Thus, based on relevant Texas and Fifth Circuit precedent, this Court concludes that Edelman was in a fiduciary capacity *vis-à-vis* DHLP due to his position as Vice President of DGP (DHLP's general partner), which permitted him to exercise complete control over DHLP.

### b) Edelman Breached His Fiduciary Duties Owed to DHLP, Resulting in Both Injury to DHLP and Benefit to Himself

As discussed in detail below, Edelman breached his fiduciary duties of loyalty and care owed to DHLP in the following ways: (1) by occupying Unit 2F for 56 months without paying rent, (2) by authorizing and directing illegal commissions be paid to Diana on the sale of Drexel Highlander condominium units, and (3) by authorizing and directing the Disputed Draws and the deposit of the resulting funds into the DDC Deposit Account. These breaches resulted in both injury to DHLP and direct and indirect benefit to Edelman. Each breach will be analyzed separately.

### (1) The Edelmans' Occupancy of Unit 2F for 56 Months Without Paying Rent

The Court concludes that Edelman breached his fiduciary duties of loyalty and care owed to DHLP when he permitted himself and his wife to occupy Unit 2F of the Drexel Highlander for 56 months, rent free. *See* § III.A, *supra*, for the Court's analysis of DHLP's trespass claim. By living rent free in Unit 2F, Edelman permitted his personal interests to prevail over the interests of DHLP, resulting in both injury to DHLP and benefit to himself.

Accordingly, based upon the record before it, the Court finds that Edelman's occupancy of Unit 2F in breach of his fiduciary duties to DHLP resulted in a direct, personal benefit to Edelman, and corresponding injury to DHLP, of $302,400, the fair market rental value of Unit 2F for the 56-month period that the Edelmans resided there rent free. *See* § III.A, *supra* for the calculation of this amount. The Court notes, however, that DHLP may not recover damages for

both trespass and breach of fiduciary duty in the amount of $302,400, as only a single recovery is permissible.

(2)     <strong>Commissions Paid to Diana</strong>

Because it is undisputed that Diana is not a licensed real estate broker or salesperson, DHLP argues that Edelman breached his fiduciary duties to it when he authorized illegal commissions on the sales of Drexel Highlander condominium units to be paid to Diana in violation of the Texas Real Estate Licensing Act ("**TRELA**"). Edelman counters that both Edelman and Diana "were employed by DDC, the Sales Agent, under an agreement with the owner of the realty, DHLP, and thus were exempted from the requirements of the TRELA." Defendant's Trial Brief [Dkt. No. 35] at 19. Specifically, Edelman cites to TRELA § 1101.005, which states, in relevant part, that the chapter does not apply to "(6) a person employed by an owner in the sale of structures and land on which structures are located if the structures are erected by the owner in the course of the owner's business." TEX. OCC. CODE § 1101.005.

For the following reasons, the Court agrees with DHLP. Edelman breached his fiduciary duties to it when he authorized illegal commissions to be paid to Diana.

First, the record does not establish that Diana was either employed by DDC, as Edelman alleged, or was otherwise properly retained to sell the Drexel Highlander condominium units. Section 7.6 of the DHLP Partnership Agreement states that "[t]he Partnership shall retain Developer [DDC] as its sale agent on terms and conditions acceptable to the Special Limited Partner." DHLP Partnership Agreement [Plaintiffs' Ex. 4] at § 7.6.[24] Moreover, the Development Agreement defines the relationship between DHLP and DCC as that of an

---

[24] The Special Limited Partner was CF Highlander SLP LLC. The CF Highlander SLP LLC's interests were acquired by other of the limited partners, which appears to have led to the May 2006 amendment to the DHLP Partnership Agreement. First Amendment to Agreement of Limited Partnership of Drexel Highlander Limited Partnership [Plaintiffs' Ex. 4] at E-000433.

independent contractor. Development Agreement [Plaintiffs' Ex. 165] at § 1(a). The DHLP Partnership Agreement was amended as of May 3, 2006 to state that "[t]he General Partner [DGP] shall have the right to retain and remove any sale[s] agent for the Project [Drexel Highlander] on terms acceptable to it in its sole discretion." First Amendment to Agreement of Limited Partnership of Drexel Highlander Limited Partnership [Plaintiffs' Ex. 4] at 4 (E-000436). Further, the Certificate of Resolution dated April 20, 2006 that appointed Edelman as Vice President of DGP expressly gave Edelman the authority to negotiate and consummate sales of the units. Certificate of Resolution [Plaintiffs' Ex. 5] at 1.

There is no evidence in the record, however, that DGP, DDC, or DHLP signed any written agreements retaining Diana to sell the Drexel Highlander condominium units, or that Diana was "employed" by DGP, DDC, or DHLP. To the contrary, Caughey testified that Diana was not an employee of DCC and that DDC's payments to her were coded as "contract labor," despite the fact that DDC never issued a Form 1099 to her. DGP and DHLP had no employees.

Second, Diana is not entitled to receive a commission under TRELA, which provides for the licensing of real estate brokers and salespersons.[25] Under TRELA, "[a] person acts as a broker or salesperson under this chapter if the person, with the expectation of receiving valuable consideration, directly or indirectly performs or offers, attempts, or agrees to perform for another person any act described by Section 1101.002(1), as a part of a transaction or as an entire transaction." TEX. OCC. CODE § 1101.004. Included under the ambit of § 1101.002(1) are acts to sell, exchange, purchase, or lease real estate. *Id.* at § 1101.002(a)(A)(i), (ii). Further, a person or business entity may not act as a broker unless it holds a license issued under the chapter. *Id.* at

---

[25] TRELA defines a "salesperson" as a "person who is associated with a licensed broker for the purpose of performing an act described in Subdivision (1)." TEX. OCC. CODE § 1101.002(8). No party has alleged that Diana is a "salesperson" under TRELA.

§ 1101.351(a), (a-1).   Indeed, it is a Class A misdemeanor if a person acts as a broker or salesperson without holding a license.  *Id.* at § 1101.758.

As cited by Edelman, § 1101.005 excepts from the requirements of TRELA "a person employed by an owner in the sale of structures and land on which structures are located if the structures are erected by the owner in the course of the owner's business."  TEX. OCC. CODE § 1101.005(6).   Here, it is undisputed that (1) DHLP, not DDC, owned the Drexel Highlander condominium units at issue prior to their sale, and (2) Diana is not a licensed real estate broker or salesperson.  Further, there is no evidence in the record that Diana was an employee of DHLP, as would be required to qualify for the cited-to exception.   Moreover, pursuant to the Texas Administrative Code, "[a]n independent contractor is not an employee" pursuant to § 1101.005(6).  22 TEX. ADMIN. CODE § 535.34.  Thus, even DCC, as the independent contractor sales agent of DHLP, was not legally entitled to receive commissions on the sale of DHLP condominium units, unless it holds a license to do so, of which there is no evidence in the trial record.

Based upon the plain language of the statute, the record simply does not support Edelman's contention that Diana, who allegedly provided "contract labor" for DDC, is excepted from the requirements of TRELA when selling DHLP's condominium units.  Accordingly, the Court finds that it was illegal for Diana to act as a broker or salesperson and receive commissions on the sales of the Drexel Highlander condominium units.

As both Wiggins and Caughey testified, net proceeds from the sale of Drexel Highlander condominium units were used to pay down amounts DHLP owed to Valliance under the Commercial Loan Agreement.  As such, DHLP was harmed by Edelman each time he authorized the improper payment of real estate commissions to Diana, as those amounts reduced the

amounts available to pay to Valliance, resulting in a higher loan balance and increased interest payments over time. Further, Edelman, as Diana's husband in a community property state, was indirectly benefitted each time he authorized a commission to be paid to her. *See* TEX. FAM. CODE §§ 3.002 – 3.003.

Plaintiffs' Exhibit 13 (DDC Paid Invoice Register) includes a list of all payments made by DDC to Diana from 2008 through 2010. *Id.* at DHLP-000519, 000536, 000550-551. At trial, Killion testified that Diana received recurring payments in 2009 and 2010 of approximately $8,333 per month that were coded as contract labor. Diana also received fluctuating amounts that, except for a few expense reimbursements, were coded as commissions. Based upon this testimony and Plaintiffs' Exhibit 13, the Court finds that $462,604.50[26] in illegal commissions was paid to Diana on the sale of Drexel Highlander condominium units from 2008 through 2010.

Accordingly, the Court finds that Edelman breached the duties of loyalty and care that he owed to DHLP by authorizing and directing that illegal commissions be paid to Diana on the sales of Drexel Highlander condominium units, resulting in injury to DHLP, and corresponding benefit to Edelman as Diana's husband, in in the amount of $462,604.50.[27]

### (3) Disputed Draws Under the DHLP Commercial Loan Agreement

The Court concludes that Edelman breached his fiduciary duties of loyalty and care to DHLP by directing DDC to improperly draw funds under the DHLP Commercial Loan Agreement, as evidenced by the Disputed Draws. The breach occurred in one of two ways, either by Edelman (1) directing DDC to improperly take DHLP's money without proper

---

[26] *See* Table at § II.C and notes 14-16, *supra.* The amount stated is the aggregate of commissions paid to Diana during that period in the following amounts: $176,052.44, $128,063, $133,501.56, and $24,987.50.

[27] Although DHLP also suffered damages in the form of increased interest costs on the Valliance loan, the Court is unable to calculate those damages based upon the record before it.

authorization, or (2) directing DHLP to "loan" $2,510,000 to DDC with the knowledge that DDC was unable to repay the loan. Prior to addressing the breach, however, the Court must first address the evidentiary objection raised at trial with respect to the documents underlying the Disputed Draws.

### (a)    Admissibility of Parol Evidence and the Parties' Course of Dealings

In his Original Answer and Counterclaims [Dkt. No. 42], Edelman alleges that "[t]he written agreement(s) which are the foundation of Plaintiffs' asserted authority and claims alleged herein are vague, ambiguous, contradictory, and, as presented by the Plaintiffs, incomplete." *Id.* at 3. Further, in the JPTO, under "Defendants' Contentions," Edelman alleges that "[d]uring the Drexel Highlander project, as in previous projects, DDC and Edelman acted within the scope of their authority by written agreement (although these written documents are ambiguous and contradictory), and[,] with Wiggins's and in the Highlander [*sic*], DGP's consent and approval." JPTO at 7, ¶4. Notably, however, Defendant has never directed this Court to precisely what language in which agreement(s) he considers vague, ambiguous, and contradictory, instead relying solely on these generalized allegations.

Subsequently, at trial, Edelman attempted to introduce evidence regarding the prior course of dealings between the parties and Valliance regarding the use of proceeds from the Commercial Loan Agreement. Because the parties failed to brief the issue prior to trial, the Court permitted Edelman to introduce evidence on this point, subject to the Plaintiffs' running objection that the evidence constituted impermissible parol evidence. After receiving post-trial briefs on this issue, the Court must now rule on the Plaintiffs' objections. For the reasons explained below, the Court sustains the objections and will exclude the testimony.

Although it is not entirely clear to the Court, it appears that Edelman is attempting to introduce evidence of the parties' prior course of dealings to establish that it was their agreed-upon practice that DDC act as the service company for project oversight and administrative matters on the various real estate projects, including the Drexel Highlander. In return, DDC would receive management and other fees from the projects. "DDC and Edelman continued the established practice concerning management of money, which came from DDC's developer fees and other fees, and draws on the Valliance loan." JPTO at 7-8, ¶ 5 (Defendants' Contentions). "As the service company for DHLP and the Drexel Highlander project, DDC caused payments to be made on behalf of DHLP for taxes, condominium association fees, utilities, and other operating costs of Drexel Highlander while the units were unsold, as well as monthly interest payments for the Valliance loan." *Id.* at 8, ¶ 7. Further, at trial, Edelman elicited testimony from Yarborough and Mantzey, formerly of Valliance, regarding their understanding of whether funds advanced under the DHLP Commercial Loan Agreement could be used for non-DHLP related investment purposes, as well as Edelman's testimony regarding the parties' past dealings.

As noted above, the Plaintiffs objected to this testimony as impermissible parol evidence intended to vary the express and unambiguous terms of the Commercial Loan Agreement, the DHLP Partnership Agreement, and the Development Agreement. At the conclusion of the trial, the Court requested briefing from the parties regarding whether the Court may consider parol evidence of the parties' course of dealings in light of the merger and anti-oral modification clauses contained in the various agreements. *See* Commercial Loan Agreement [Plaintiffs' Ex. 14] at § V ("No modification, consent, amendment or waiver of any provision of this Agreement, no consent to any departure by Borrower therefrom shall be effective unless the same shall be in writing and signed by an officer of Lender, and then shall be effective only in the specific

instance and for the purpose for which given."); DHLP Partnership Agreement [Plaintiffs' Ex. 4] at § 14.2 ("Unless otherwise expressly stated in this Agreement, amendments to this agreement shall become effective only upon the execution of said amendments by all of the Parties"), § 14.7 ("This Agreement represents the entire agreement and understanding of the parties hereto and all prior or concurrent agreements, commitments, letters of intent, deal term sheets, understandings, representations and warranties in regard to the subject matter hereof (including the Prior Agreement) are and have been merged herein and are superseded hereby."); Development Agreement [Plaintiffs' Ex. 165] at § 20 ("This Agreement embodies the entire understanding of the parties with respect to the matters described herein, and except for the Guaranty and the Indemnity there are no further agreements or understandings, written or oral, in effect between the parties relating to the subject matter hereof.").

In his post-trial brief, Edelman argues that, even if a contract is unambiguous on its face and contains a merger clause, the Court may consider "the circumstances surrounding the contract" and "the customs and practices of the industry and locale(s) to which the contract relates," including the parties' course of dealings. Defendant's Post-Trial Brief [Dkt. No. 120] at 17-19 (citing cases). The Court, however, finds the cases relied upon by Edelman for these propositions unpersuasive.

For example, Edelman cites to *Sun Oil Co v. Madeley*, 626 S.W.2d 276 (Tex. 1981), for the proposition that, when the construction of a contract is at issue, the court must first consult surrounding circumstances to determine whether or not the contract is ambiguous. Defendant's Post-Trial Brief [Dkt. No. 120] at 17 (citing *Sun Oil*, 626 S.W.3d at 731). In his brief, Edelman selectively quotes *Sun Oil* as follows:

> In addition to their difference of opinion on the proper interpretation of the contract, the parties also dispute the role of extrinsic evidence in construing an

> unambiguous contract. Sun argues the courts may only consider extrinsic evidence after the instrument itself is first found to be ambiguous. Lessors argue that when the construction of a contract is at issue, the court must first consult surrounding circumstances to determine whether or not the contract is ambiguous....
>
> ... Lessors state the proper rule. Evidence of surrounding circumstances may be consulted. If, in the light of surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing.

*Id.* The *Sun Oil* court, however, then goes on in the next few sentences to say:

> Consideration of the facts and circumstances surrounding the execution of a contract, however, is simply an aid in the construction of the contract's language. There are limits. For example, **when interpreting an integrated writing, the parol evidence rule circumscribes the use of extrinsic evidence**.

*Sun Oil*, 626 S.W.2d at 731 (emphasis added). The *Sun Oil* court then states that "[s]ince we agree the lease is unambiguous, we shall confine our review to the lease and enforce it as written." *Id.* at 733.

Similarly, Edelman quotes *Stewart v. Selder*, 473 S.W.3d 3, 7 (Tex. 1971) as stating:

> [T]he words of a legal instrument are simply indices to external things, and words always need interpretation. It is always necessary to determine their association with external objects, and all circumstances should be considered that go to make clear the sense in which they were used, i.e., their association with things.

Defendant's Post-Trial Brief [Dkt. No. 120] at 17. In *Stewart*, however, the Texas Supreme Court was interpreting a will, and went on in the next paragraph to say that:

> A will is a unilateral instrument, and the court is concerned only with the intention of the testator as expressed in the document. The sense in which the words were used by the testator is the ultimate criterion, and the court may always receive and consider evidence concerning the situation of the testator, the circumstances existing when the will was executed, and other material facts that will enable the court to place itself in the testator's position at the time.

*Stewart*, 473 S.W.2d at 7. As evidenced by its later discussion in *Sun Oil*, the Texas Supreme Court's statements in respect of a will in *Stewart* are clearly not applicable to a non-unilateral, non-testamentary contract.

**MEMORANDUM OPINION** 41

Edelman's other cited-to cases are similarly unpersuasive.  *See, e.g., Hanssen v. Qantas Airways, Ltd.*, 904 F.2d 267 (5th Cir. 1990) (looking to industry practice after contract determined to be ambiguous on its face); *Chase Manhattan Bank v. First Marion Bank*, 437 F.2d 1040 (5th Cir. 1971) (construing the New York parol evidence rule in the context of the New York Uniform Commercial Code); *Luling Oil & Gas Co. v. Humble Oil & Ref. Co.*, 191 S.W.2d 716, 724 (Tex. 1945) ("When an agreement is silent or obscure as to a particular subject, the law of usage become[s] a portion of it and constitute[s] a supplement to it and interpret[s] it."); *Bob Robertson, Inc. v. Webster*, 679 S.W.3d 689 (Tex. App. -- Houston [1st Dist.] 1984, no writ) (considering extrinsic evidence regardless of merger clause because the merger clause "is contradicted by the instrument itself, which refers to delivery numerous times and yet contains no delivery date … [and] [i]t cannot be said that an oral agreement regarding time of delivery is inconsistent with the terms of the integrated agreement"); *Krupp v. Belin Cmtys., Inc.*, 582 S.W.2d 514, 519 (Tex. App. -- Houston [1st Dist.] 1979, writ ref'd n.r.e.) (concluding that where, on contract form, there was signature space with instruction that approval by corporate officer was required, and such space had not been signed or initialed, trial judge was entitled to consider parties' course of dealing and performance in determining whether such contract was intended by parties as final expression of their agreement).  Overall, the cases cited by Edelman in his post-trial brief do nothing more than state general propositions of law that are either not applicable to the case at hand or not helpful to Edelman's arguments generally.

When interpreting a contract under Texas law, a court's primary concern is to ascertain and give effect to the written expression of the parties' intent.  *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006).  By this approach, courts "strive to honor

the parties' agreement and not remake their contract by reading additional provisions into it." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). The parties' intent is governed by what is written in the contract, not by what one side contends they intended but failed to say. *Id.* at 127. Thus, "it is objective, not subjective, intent that controls." *Matagorda Cnty. Hosp. Dist. v. Burwell,* 189 S.W.3d 738, 740 (Tex. 2006) (*per curiam*) (citing *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)). A court must therefore give terms their plain and ordinary meaning unless the contract indicates that the parties intended a different meaning. *Dynegy Midstream Servs., Ltd. P'ship. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). A court does not consider only those parts of a contract that favor one party, *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005), but examines the writing as a whole to harmonize and give effect to all of the contract's provisions. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). The court must consider the contract from a utilitarian standpoint and bear in mind the particular business activity to be served, and, when possible and proper to do so, avoid a construction that is unreasonable, inequitable, and oppressive. *Frost Nat'l. Bank v. L & F. Distribs., Ltd.,* 165 S.W.3d 310, 312 (Tex. 2005) (*per curiam*); *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex. 1987).

If a contract is not ambiguous, courts must enforce it as written without considering parol evidence for the purpose of creating an ambiguity or giving the contract "a meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (*per curiam*). The contract is unambiguous if it can be given a certain or definite meaning as a matter of law. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.,* 389 S.W.3d 802, 806 (Tex. 2012). A contract is not ambiguous simply because the parties advance conflicting interpretations. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589

(Tex. 1996).  If the contract is subject to more than one reasonable interpretation after applying the pertinent rules of contract construction, then the contract is ambiguous and there is a fact issue regarding the parties' intent.  *El Paso Field Servs.,* 389 S.W.3d at 806; *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

The parties appear to agree that the operative documents regarding the appropriateness of the Disputed Draws and subsequent use of the funds are (1) the DHLP Partnership Agreement, (2) the Development Agreement, and (3) the Commercial Loan Agreement.  The Court questions whether the Development Agreement expired by its terms once the Drexel Highlander was fully constructed.  *See* Development Agreement [Plaintiffs' Ex. 165] at §§ 4(b)(i), 9 ("The terms of this Agreement … shall expire at the earlier of … the Final Project Completion….").  However, the parties proceeded through trial under the belief that the Development Agreement was a current contract, so the Court will do so as well.

Pursuant to the DHLP Partnership Agreement, dated as of April 12, 2004:

> **All funds of the Partnership shall be deposited or invested in its name and accounts** with [First United Bank and Trust Company] or, if so determined by the Partners, in alternative depositories.  The funds shall be segregated from other funds or accounts of the General Partner and shall be insured by an agency of the United States of America, Securities of the United States government, or other investments or depository media designated by the General Partner and withdrawals therefrom (or liquidation thereof) shall be made upon the signature of the representative of the General Partner.

DHLP Partnership Agreement [Plaintiffs' Ex. 4] at § 9.1 (emphasis added).

Pursuant to the Development Agreement between DHLP and DDC, also dated as of April 12, 2004:

> Until further notice, the following individual has authority to act for Developer: Robert Edelman.

Development Agreement [Plaintiffs' Ex. 165] at § 1(b).  Further pursuant to the Development Agreement:

(a) **All monies received by Developer [DDC] for or on behalf of Owner [DHLP] in connection with the Project shall promptly be deposited by Developer in an account established at a bank approved by Owner (the "Bank Account"), and such monies shall not be commingled by Developer with any funds belonging to, or held on behalf of anyone other than Owner.**

(b) **Developer shall disburse and pay from the Bank Account such amounts at such times as may be required, in connection with the development of the Property in accordance with the provisions of this Agreement.** On the 15th day of each month during the terms of this Agreement, Developer will disburse to Owner or at the direction of Owner all funds remaining in the Bank Account after payment of all expenses and fees provided hereunder for the preceding calendar month, less an amount for working capital equal to the that provided for in the Project Budget. In the event the amounts in the Bank Account are less than the approved expenses payable and working capital provided hereunder, Developer shall notify Owner thereof and Owner shall as soon as possible deposit into said account an amount not less than such deficiency.

(c) Designated officers and employees of Developer shall be the authorized signatories on the Bank Account and shall have authority to make disbursements from such Bank Account.

*Id.* at § 8(a)-(c) (emphasis added). Further pursuant to the Development Agreement:

(b) Parties in General. Nothing herein contained shall be construed or deemed to alter, change or modify any of the rights or obligations which Developer, Owner or their affiliates may have under any other agreement to which they are parties (including, without limitation, the Amended and Restated Agreement of Limited Partnership governing Owner….

*Id.* at § 6(b).

Pursuant to the Commercial Loan Agreement, dated effective as of March 5, 2008:

Subject to the terms and conditions and relying upon the representations and warranties herein set forth, and provided that no event of Default or Potential Default has occurred and is continuing, **Lender agrees to advance** (i) the Loan Amount less the Interest Carry Reserve (defined herein), the 2008 Real Estate Tax Reserves (defined herein) and the Working Capital Reserve (defined herein) to Borrower on the Closing Date by wire transfer in immediately available funds to the title company for the benefit of borrower; (ii) SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($600,000.00) (the "Interest Carry Reserve") in multiple advances to Lender on each Payment Date (as defined in the Note) by book entry to be applied as payments of accrued and outstanding interest on the Obligation; (ii) TWO HUNDRED TWENTY FIVE THOUSAND AND NO/100 DOLLARS ($225,000.00) (the "2008 Real Estate Tax Reserve") to be released to the taxing authority upon receipt of the 2008 tax statement; and (iv) SIX

HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($650,000.00) (the "Working Capital Reserve") **in multiple advances to Borrower [DHLP].**

Commercial Loan Agreement [Plaintiffs' Ex. 14] at § VI(c) (emphasis added).

The Court finds the DHLP Partnership Agreement, the Development Agreement, and the Commercial Loan Agreement, when read individually or in conjunction with one another, unambiguous.  The plain language of these documents shows that:  (1) Edelman was authorized to act on behalf of DDC,[28] (2) the Commercial Loan Agreement requires that advances by Valliance be funded to DHLP,[29] (3) the DHLP Partnership Agreement requires such funds be deposited into an account in DHLP's name,[30] and (4) any funds that DDC did receive for or on behalf of DHLP were to be deposited into a segregated account and not comingled with funds held on behalf of anyone but DHLP.[31]   Accordingly, the Plaintiffs' objection to Edelman's attempt to introduce parol evidence and/or course of dealings into the record to modify the express and unambiguous terms of these contracts is sustained.

Although the Court will not permit parol evidence into the record to modify the express terms of unambiguous contracts, it notes that the admission of the parol evidence offered by Edelman into the record would not have materially changed the outcome here.  Edelman clearly breached the fiduciary duties he owed to DHLP, as explained below.  At most, the admission of Edelman's proffered parol evidence would have reduced the benefit received by Edelman by the amount of funds DDC advanced to other potential projects during the relevant period.  According to Caughey's testimony, those amounts are reflected as predevelopments costs in DDC's financial statements.  That reduction, however, would not have been material in light of

---

[28] Development Agreement [Plaintiffs' Ex. 165] at §1(b).

[29] Commercial Loan Agreement [Plaintiffs' Ex. 14] at § VI(c).

[30] DHLP Partnership Agreement [Plaintiffs' Ex. 4] at § 9.1.

[31] Development Agreement [Plaintiffs' Ex. 165] at § 8(a).

the overall amounts awarded by the Court. Testimony of Wiggins; Plaintiffs' Ex. 10 at RE-001218 (DDC 2008 Financial Statement) (showing $2,384 in predevelopment costs); Ex. 11 at RE-000967 (DDC 2009 Financial Statement) (showing $9,149 in predevelopment costs); Ex. 12 at RE-000449 (DDC 2010 Financial Statement) (showing $10,015.67 in predevelopment costs). Although Edelman argued that DDC also funded other projects, as done in accordance with past practice, he failed to detail or quantify those amounts at trial. Further, even if the Court accepted as true the allegation that DDC was authorized to use funds from the Commercial Loan Agreement to search out new investments and pay related project costs, that evidence does not show that it was the parties' agreement that funds from the Disputed Draws be paid to Edelman or used for his personal benefit.

**(b)      Edelman's Breaches of Fiduciary Duties Related to the Disputed Draws**

The record clearly shows that Edelman breached the fiduciary duties of loyalty and care he owed to DHLP by either (1) authorizing and directing the Disputed Draws and deposit of the resulting funds into the DDC Deposit Account in direct contravention of the DHLP Partnership Agreement, the Development Agreement, and the Commercial Loan Agreement, or (2) directing DHLP to loan the Disputed Draws to DDC when he knew that DDC would be unable to repay the debt. *See* § II.B.3, *supra*. In either event, a substantial portion of these funds were then paid to the Edelmans or used to pay the Edelmans' personal expenses. *See* § II.C, *supra*. Other than $34,394.35 that Diana testified was spent on dry cleaning the uniforms of concierge and housekeeping staff who worked at the Drexel Highlander, Edelman was unable to account for DDC's use of the Disputed Draws or to show that the funds were spent on DHLP's behalf.

The record further establishes that, when the Disputed Draws were occurring, DDC's other revenue streams were dwindling and DDC was operating at a substantial loss. *See* DDC

Financial Statements [Plaintiffs' Ex. 10] at RE-001219 (showing negative net income in 2008 of $694,044), [Plaintiffs' Ex. 11] at RE-000973 (showing negative net income in 2009 of $1,348,113), [Plaintiffs' Ex. 12] at RE-000450 (showing negative net income in 2010 of $958,345.08). Since DDC was the entity making substantial monthly contract labor payments to the Edelmans, along with paying substantial personal expenses for them, Edelman needed funds to be available at DDC. The evidence establishes that the primary purpose of the Disputed Draws was to ensure that DDC had sufficient funds available to it so that the Edelmans' lifestyle was not compromised during the downturn in the Texas real estate market.

Regardless of whether the Disputed Draws were taken in violation of the parties' agreements or improperly loaned by DHLP to DDC, the underlying acts by Edelman were in breach of the duties of loyalty and care owed by him to DHLP *vis-a-vis* his position as Vice President of DGP, DHLP's general partner. Since the Court has concluded that Edelman breached his fiduciary duties owed to DHLP, it will now address the resulting injury to DHLP and benefit to Edelman.

### (i)      Award Based Upon Injury to DHLP

In the Fifth Circuit, damages related to breach of fiduciary duty are defined broadly to include "any loss" suffered by the corporation as a result of the director's breach. *Meyers v. Moody*, 693 F.2d 1196, 1214 (5th Cir. 1982) (breach of fiduciary duty by corporate director); *Floyd v. Hefner*, 556 F.Supp.2d 617, 652 (S.D. Tex. 2008) (same); *In re Jackson*, 141 B.R. 909, 915 (Bankr. N.D. Tex. 1992) (breach of fiduciary duty by corporate officer). The Fifth Circuit has held that, in breach of fiduciary duty cases, "litigants and courts must be flexible and imaginative in calculating the proper measure of damages." *Floyd*, 556 F.Supp.2d at 652 (citing *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 487 (5th Cir. 2000)).

The record before the Court clearly establishes that Edelman breached his duties of loyalty and care owed to DHLP with his actions related to the Disputed Draws.  The Court expected Edelman to attempt to show that DDC spent the money – or at least some portion of it – to pay DHLP's business expenses, thus reducing both the alleged injury to DHLP and his personal benefit from the transactions.  Edelman, however, failed to account for the use of the funds at trial.  In fact, the only evidence Edelman offered in this regard is Diana's testimony that (1) the dry cleaning expenses ($34,394.35) were related to uniforms for staff working at the Drexel Highlander, and (2) certain of the amounts charged by her to the DDC AMEX card in her name were for DHLP's benefit.  Diana, however, failed to quantify the DHLP-related amounts allegedly charged by her on the DDC AMEX card in her name.

During closing arguments, the Court expressed its surprise that Edelman had not attempted to account for DDC's use of the Disputed Draws.  The Court asked Edelman's counsel if it was possible to perform such an accounting based upon the documentary evidence in the record and, if so, to include an accounting (or at least an explanation) of how the funds were spent in his post-trial brief.  Defendant's Post-Trial Brief [Dkt. No. 120] contains a section titled "Where the Money Went," which generally references this Court to Defendant's Exhibits 21 through 54, which are the various draw requests made on DDC letterhead.  A review of these documents, however, was not helpful in accounting for how DDC spent the $2,475,605.65 in Disputed Draws remaining after deducting the dry cleaning expenses paid on DHLP's behalf.

As just noted, Defendant's Exhibits 21 through 54 are copies of various draw requests made by DDC under the Commercial Loan Agreement, which are mostly duplicates of Plaintiffs' Exhibit 174 (Table of Loan Advances and supporting documents).  At trial, Edelman highlighted these exhibits to show that Plaintiffs' Exhibit 174 was incomplete and did not contain all draws

requests made under the Commercial Loan Agreement.  As testified to by Killion, however, Plaintiffs' Exhibit 174 is comprised of draw requests that resulted in a deposit into the DDC Deposit Account, and the Plaintiffs' damages calculation (reflected in Plaintiffs' Exhibit 149) excludes amounts drawn that the Plaintiffs believe were used for proper business purposes, such as interest payments on the Valliance loan[32] and payment of property taxes on the Drexel Highlander.  Although these exhibits show that DDC did, in fact, use some drawn amounts to pay DHLP expenses, those amounts were already backed out of the Plaintiffs', as well as the Court's, calculations.

Edelman further argues that Killion did not have access to all of the information underlying the AMEX invoices in order to property classify the expenses as reflected in the Plaintiffs' damages calculation, and that various types of business expenses, including gifts for brokers, dinners with brokers, flowers in Drexel Highlander's lobby, candy for tenants, and snacks for potential buyers are not properly classified as "personal" expenses incurred by the Edelmans.  Defendant's Post-Trial Brief [Dkt. No. 120] at 25-27.  Thus, according to Edelman, "[n]o direct evidence showed that DHLP money was used for Diana Edelman's personal use, or that the American Express charges were paid with DHLP money."  *Id.* at 26.

To the contrary, Plaintiffs' Exhibits 150 and 156 are comprised of voluminous AMEX invoices and receipts that underlie Killion's testimony and Plaintiffs' Exhibit 149.  Notably, Killion testified that she did not have all the receipts underlying the AMEX invoices because they were not produced by Edelman or contained in the books and records turned over to the

---

[32] Edelman's contention in his post-trial brief that "money was regularly drawn from the Valliance loan to pay the interest on the loan, which was deposited in the DDC Account" is incorrect.  *See* Defendant's Post-Trial Brief [Dkt. No. 120] at 25.  As testified to by Caughey, DDC's in-house accountant, draws under the Commercial Loan Agreement used to pay interest to Valliance were not true "draws" in the sense that the requested funds were never deposited into the DDC Deposit Account, but were instead handled via an internal book entry by Valliance.  *See* Commercial Loan Agreement [Plaintiffs' Ex. 14] at § VI(c).

Plaintiffs, despite the fact that the IRS requires persons and entities to keep receipts and denote the purpose of the business expense sought to be deducted.  Edelman introduced no evidence, nor provided any meaningful post-trial analysis, refuting Killion's testimony.

Other than the dry cleaning expenses, there is absolutely nothing in the record to indicate that any of the $2,510,000 in Disputed Draws was either returned to DHLP or used to pay DHLP's legitimate business expenses.  Accordingly, the Court finds that Edelman's breach of fiduciary duties related to the Disputed Draws resulted in injury to DHLP of $2,475,605.65.

**(ii)**      **Alternatively, Award Based Upon Benefit to Edelman**

Although the Court believes that DHLP suffered an injury of $2,475,605.65 due to Edelman's breaches of fiduciary duties in relation to the Disputed Draws, and that this is the proper measure of damages, the Court will alternatively make findings as to the direct and indirect benefit Edelman received from his breaches of fiduciary duties related to the Disputed Draws.

At trial, Killion testified regarding $2,014,257.31 that was allegedly either paid to Edelman or used for his direct or indirect benefit.  *See* Plaintiffs' Ex. 149 (DDC Net Loss vs. Edelman Compensation + Benefits).  As explained in Section II.C, above, however, the Court does not agree with the Plaintiffs' calculation.  Based upon its independent calculation, the Court finds that $880,951.96[33] of the drawn funds were either paid to Edelman or for his direct or indirect benefit.

The Court notes that DDC's 2008 Financial Statement indicates that it had $475,964 in cash deposited with Valliance as of December 31, 2008.  DDC 2008 Financial Statements

---

[33] Calculated as the contract labor payments to the Edelmans plus the amounts paid to AMEX on account of the Edelmans' personal expenses.  *See* table (and related footnote) in Section II.C, *supra*.  Amounts paid as commissions are not included in this calculation because commissions were payable from sale proceeds and, thus, would not have been paid from the Disputed Draws.

**MEMORANDUM OPINION**                                                                                       51

[Plaintiffs' Ex. 10] at RE-001215, RE-001218.  Since only $150,000 of Disputed Draws had been deposited into the DDC Deposit Account by December 31, 2008, DDC had $325,964 of other funds on hand prior to the first Disputed Draw.  *See* Draw Request [Plaintiffs' Ex. 174(1)]. Further, DDC's 2009 and 2010 Financial Statements indicate that DDC had other income each year.  *See* DDC 2009 Financial Statements [Plaintiffs' Ex. 11] at RE-000968 (showing $323,564 in income) and DDC 2010 Financial Statements [Plaintiffs' Ex. 12] at RE-000451 (showing $264,596 in income).  As such, the Court is unable to determine whether all or part of the $880,951.96 paid to Edelman or for his direct or indirect benefit after the first Disputed Draw was paid from funds drawn under the DHLP Commercial Loan Agreement or from other sources.

The Court, however, does not believe that DHLP's failure to trace, or the Court's inability to trace, the funds paid to Edelman or for his direct or indirect benefit is fatal.  As reflected in DDC's Financial Statements, DDC's expenditures greatly exceeded its independent income each of the relevant years.  *See* Plaintiffs' Ex. 10 [DDC 2008 Financial Statements] at RE-001223-1124 (showing $2,003,591 in income and $2,474,588 in expenses); Ex. 11 [DDC 2009 Financial Statements] at RE-000968 (showing $323,564 in income and $ 1,671,677 in expenses); Ex. 12 [DDC 2010 Financial Statements] at RE-000451-0452 (showing $234,255 in income and $1,188,870 in expenses).  It is clear that, without the misappropriated funds, DDC would not have been able to pay the vast majority of its expenses, including the amounts it paid to Edelman or for his direct or indirect benefit, after the first Disputed Draw was made. Therefore, the Court will not consider the inability to trace funds in this instance an impediment to its finding that Edelman breached his fiduciary duties owed to DHLP, when it was Edelman himself who established the account in question, directed the Disputed Draws and subsequent co-

mingling of funds, and then used those co-mingled funds for his personal benefit, all while exercising control over each of DDC, DGP, and DHLP. *Cf. In re Colson*, 2013 WL 5352638, at * 33 (Bankr. S.D. Miss. Sept. 23, 2013) ("The Court agrees with Colson that the question of what happened to the money was not answered definitively at Trial. The Court rejects, however, Colson's attempt to use Fidelity's inability to trace the escrow funds as a defense to his breach of the fiduciary duty he owed the lenders. It was Colson who structured the accounts in a way that allowed him to play hide-and-seek with escrow funds. To allow Colson to benefit from the complexity of that structure by requiring Fidelity to untangle the commingled funds would reward him for how well he succeeded in breaching his fiduciary duty to the lenders.").

As such, the Court alternatively finds that $880,951.96 of the Disputed Draws was either paid to Edelman or for his direct or indirect benefit.

### (4) Exemplary Damages for Breaches of Fiduciary Duty

Chapter 41 of the Texas Civil Practices and Remedies Code "applies to any action in which a claimant seeks damages relating to a cause of action." TEX. CIV. PRAC. REM. CODE § 41.002(a). Section 41.003 mandates that "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence." *Id.* at § 41.003(a). Malice is defined as "a specific intent by the defendant to cause substantial injury or harm to the claimant." *Id.* at § 41.001(7). However, where "a fiduciary gains a benefit by breaching his fiduciary duty, willful and fraudulent acts may be presumed." *In re Sherali*, 490 B.R. at 121 (citing *Lesikar v. Rappeport*, 33 S.W.3d 282, 310 (Tex. App. -- Texarkana, pet. denied). Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of: "(1)(A) two times the amount of economic damages; plus (B) an

amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or (2) $200,000." *Id. at* § 41.008(b).

The U.S. Supreme Court has established three factors to be considered in granting exemplary damages: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Bunton v. Bentley*, 153 S.W.3d 50, 53 (Tex. 2004) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)); *Sherali*, 490 B.R. at 122. Although courts do not use a strict mathematical rule in calculating exemplary damages, typically such damages will not exceed a 4:1 ratio of exemplary to actual damages. *Sherali*, 490 B.R. at 122 (citing *Bennett v. Reynolds,* 315 S.W.3d 867, 873 (Tex. 2010)).

The Court has concluded that Edelman breached the fiduciary duties of loyalty and care he owed to DHLP in three instances: (1) by authorizing and directing the Disputed Draws and the deposit of the resulting funds into the DDC Deposit Account or, alternatively, by improperly directing DHLP to loan the Disputed Draws to DDC knowing that DDC would be unable to repay the loan, (2) by occupying Unit 2F of the Drexel Highlander for 56 months without paying rent, and (3) by authorizing and directing that illegal commissions be paid to Diana on the sales of condominium units at the Drexel Highlander. As discussed above, the Court has previously found that Edelman acted intentionally and obtained a benefit from these breaches of fiduciary duty; thus, fraudulent acts are presumed for purposes of exemplary damages. *Lesikar*, 33 S.W.3d at 311 ("While it is a general rule that Texas courts allow the recovery of punitive damages where the defendant, in committing a tort, acted willfully, maliciously, or fraudulently,

where punitive damages are awarded for breach of fiduciary duty the actual motives of the defendant and whether the defendant acted with malice are immaterial."). Further, even without this presumption, the Court concludes that Edelman's actions with respect to the Disputed Draws and his occupancy of Unit 2F were done with malice. Accordingly, the Court will award exemplary damages.

First, the record establishes by clear and convincing evidence that Edelman's actions with respect to the Disputed Draws were done with malice. He directed that DHLP's funds be placed into the DDC Deposit Account. Once deposited, the funds were not used to pay DHLP's legitimate business expenses, despite the fact that DHLP was the party liable under the Commercial Loan Agreement to repay Valliance. Instead, Edelman directed that substantial amounts of these funds either be paid to him or used for his direct and indirect benefit. Based upon the record before it, the Court firmly believes that Edelman took these actions intentionally and with the specific intent to cause substantial injury or harm to DHLP. Further, based upon the facts of this case, fraudulent actions may be presumed, also supporting an award of exemplary damages. Edelman's actions in this regard resulted in actual damages to DHLP of $2,475,605.65, for which this Court will award exemplary damages of $1,000,000.

Second, the record establishes by clear and convincing evidence that Edelman, while a fiduciary of DHLP, permitted himself and his wife to occupy Unit 2F of the Drexel Highlander for 56 months without paying rent in breach of the fiduciary duties he owed to DHLP. Based upon the record before it, the Court firmly believes that Edelman took these actions intentionally and with the specific intent to cause substantial injury or harm to DHLP, the owner of Unit 2F. Further, based upon the facts of this case, fraudulent actions may be presumed, also supporting

an award of exemplary damages. Edelman's actions in this regard resulted in actual damages to DHLP of $302,400, for which this Court will award exemplary damages of $150,000.

Prior to moving on, the Court notes its prior ruling in Section III.A, above, regarding the Edelmans' trespass onto Unit 2F. In its trespass analysis, the Court found that, prior to receiving the Notice to Vacate, the Edelmans believed that they were occupying Unit 2F under a lease and, therefore, the Court declined to find that such occupancy was done with malice. This trespass analysis, however, does not apply to Edelman's breaches of fiduciary duties related to his rent-free occupancy of Unit 2F. Even if the Edelmans believed that they were occupying Unit 2F under a lease, the alleged lease was at a rental rate of approximately 3.7% of its fair market rental value ($200 per month versus $5,400 per month), and, in any event, Edelman failed to pay *any* rent to DHLP during his 56-month occupancy.

Finally, with respect to the illegal commissions, the evidence establishes that Diana did assist in selling DHLP's condominium units. And, there is there is no evidence indicating that Edelman, a non-lawyer, knew that it was improper to pay Diana a commission when her efforts resulted in a sale. Accordingly, the Court declines to find that Edelman's actions with respect to the illegal commissions were taken with the specific intent to cause substantial injury or harm to DHLP, particularly when it seems as though DHLP would have paid commissions to a licensed broker or salesperson had Diana not done the work that she did. Regardless, because Edelman's acts were taken intentionally, and he gained a benefit from his breaches of fiduciary duty, fraudulent actions may be presumed and DHLP is entitled to an award of exemplary damages in any event. Edelman's actions in this regard resulted in actual damages to DHLP of $462,604.50, for which this Court will award exemplary damages of $250,000.

### C. Violation of the Texas Theft Liability Act (DHLP v. Edelman)

The Texas Theft Liability Act ("**TTLA**") provides a civil cause of action to victims of theft, as defined by the Texas Penal Code. *See* TEX. CIV. PRAC. & REM. CODE §§ 134.001–.005. The TTLA allows for the recovery of actual damages from a person who commits "theft," plus up to $1,000 in additional damages, court costs, and reasonable and necessary attorneys' fees. *Id.* at § 134.005.

The TTLA defines "theft" as "unlawfully appropriating property or unlawfully obtaining services as described by Section 31.03, 31.04, 31.06, 31.07, 31.11, 31.12, 31.13 or 31.14, Penal Code." *Id.* at § 134.002(2). The provision implicated here is § 31.03, which provides that "[a] person commits an offense if he unlawfully appropriates property with the intent to deprive the owner of property." TEX. PEN. CODE § 31.03(a). The Penal Code defines "appropriate" as "to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another; or to acquire or otherwise exercise control over property other than real property." *Id.* at § 31.01(4). As relevant here, "[a]ppropriation of property is unlawful if: (1) it is without the owner's effective consent; [or] (2) the property is stolen and the actor appropriates the property knowing it was stolen by another." *Id.* at § 31.03(b)(1)-(2).

The elements of a cause of action under the TTLA are: (1) the plaintiff had a possessory right to property;[34] (2) the defendant unlawfully appropriated property in violation of the Texas Penal Code; and (3) the plaintiff sustained damages as a result of the theft. TEX. CIV. PRAC. & REM. CODE §§ 134.002(2), 134.003; TEX. PEN. CODE § 31.03(a); *see Olufemi–Jones v. Bank of America, N .A.,* 2013 WL 1482544, at *3 (N.D. Tex. April 10, 2013). The Plaintiffs must prove

---

[34] Money is considered a form of property. *See* TEX. PEN. CODE § 31.01(5)(C) (defining "property" for purposes of § 31.03 as "a document, including money, that represents or embodies anything of value").

their claim by a preponderance of the evidence.  *In re Powers*, 261 Fed. Appx. 719, at *2 (5th Cir. 2008) (unpublished); *In re Cowin*, 492 B.R. 858, 894-95 (Bankr. S.D. Tex. 2013).

DHLP alleges that Edelman committed theft under Texas Penal Code § 31.03 by unlawfully appropriating DHLP funds and property without DHLP's consent and with the intent to deprive DHLP of those funds and property.  Plaintiffs' Amended Petition [Dkt. No. 54] at ¶ 73.  Specifically, DHLP alleges that "Edelman knowingly and intentionally stole $2,510,000 of DHLP's funds and permanently deprived DHLP of that money by spending it on a variety of non-partnership expenses…." JPTO at 3, ¶ 5 (Plaintiffs' Contentions); *see also* Plaintiffs' Trial Brief [Dkt. No. 29] at ¶ 24-26.

As previously explained by the Court, one of two things happened at Edelman's direction.  Either Edelman (1) improperly directed that the Disputed Draws be made and the resulting funds deposited into the DDC Deposit Account, or (2) improperly directed DHLP to loan the Disputed Draws to DDC with the knowledge that DDC would be unable to repay the loan.  The Court finds that Edelman committed theft under the TTLA in either instance.

In the first instance, Edelman utilized his position of control over multiple entities to direct Valliance to deposit DHLP's funds into the DDC Deposit Account, despite the fact that DHLP had a possessory right to the Disputed Draws as the only entity authorized to receive funds per the terms of the Commercial Loan Agreement.  Once the deposit occurred, Edelman considered the funds to be DDC's property to the exclusion of DHLP.  He then directed DDC to transfer a significant amount of the funds either to him or for his direct or indirect benefit.  In fact, Edelman was only able to prove that $34,394.35 of the Disputed Draws were spent on DHLP's behalf for dry cleaning the uniforms of individuals working at Drexel Highlander.  Under the TTLA, Edelman unlawfully appropriated the Disputed Draws without DHLP's

effective consent and with the intent to permanently deprive DHLP of the funds, resulting in damages to DHLP of $2,475,605.65 (the amount of the Disputed Draws, les the dry cleaning expenses paid on its behalf).

In the second instance, the purported "loan" also resulted in a violation of the TTLA.  As discussed in more detail above, each Disputed Draw under the Commercial Loan Agreement was funded by Valliance, at Edelman's direction, directly into the DDC Deposit Account.  As testified to by Caughey, the Disputed Draw amount was then booked, at his insistence, by each entity as a loan from DHLP to DDC, despite Edelman's initial refusal account for the funds as a loan on the companies' respective books and records.  Based upon Caughey's testimony, booking the Disputed Draws as a "loan" was an afterthought.  Indeed, the record reflects that there is no promissory note, interest rate, or repayment terms underlying the "loan," and Edelman was aware that DDC would never be able to repay the funds in any event.  Based upon the record, the Court finds that the Disputed Draws were not a true loan from DHLP to DDC, but instead the result of Edelman's misappropriation of the funds, as discussed immediately above.

Accordingly, the Court awards DHLP $2,475,605.65 in actual damages for Edelman's violation of the TTLA, plus $1,000 in statutory damages and reasonable and necessary attorneys' fees and court costs to be proven at a later date.  The Court notes, however, that the $2,475,605.65 awarded to DHLP for Edelman's violation of TTLA is duplicative of the identical amount awarded to DHLP for Edelman's breach of fiduciary duty.  DHLP may only receive a single recovery of these damages.

DHLP also requests exemplary damages related to Edelman's violation of the TTLA.  As discussed in § III.B.2.b)(4), above, Chapter 41 of the Texas Civil Practices and Remedies Code "applies to any action in which a claimant seeks damages relating to a cause of action."  TEX.

CIV. PRAC. REM. CODE § 41.002(a). Section 41.003 mandates that "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence. *Id.* at § 41.003(a). As noted previously, malice is defined as "a specific intent by the defendant to cause substantial injury or harm to the claimant." *Id.* at § 41.001(7). Exemplary damages under the TTLA, however, are not subject to the statutory cap set forth in § 41.008(b). *Id.* at § 41.008(c)(13).[35]

Here, the record establishes by clear and convincing evidence that Edelman's actions with respect to his theft of the Disputed Draws were done with malice, as Edelman had the specific intent to cause substantial injury or harm to DHLP by: (1) unlawfully appropriating the Disputed Draws without DHLP's effective consent, and (2) permanently depriving DHLP of its funds. As just found, Edelman's actions in this regard resulted in actual damages to DHLP of $2,475,605.65, for which this Court will award exemplary damages of $1,000,000. However, because the $1,000,000 of exemplary damages being awarded to DHLP for Edelman's violation of the TTLA is duplicative of the identical amount of exemplary damages being awarded to DHLP for Edemlan's breach of fiduciary duty for his actions related to the Disputed Draws, the Court concludes that DHLP may only receive a single recovery of these damages.

### D. Fraud by Nondisclosure (All Plaintiffs v. Edelman)[36]

Wiggins, DGP, and DHLP have each alleged that Edelman is guilty of fraud by nondisclosure regarding: (1) the wrongful transfer of $2,510,000 in DHLP funds to the DDC

---

[35] Section 41.008(c) states in relevant part that: "[t]his section does not apply to a cause of action against a defendant from whom a plaintiff seeks recovery of exemplary damages based on conduct described as a felony in the following sections of the Penal Code if…the conduct was committed knowingly or intentionally: … (13) Chapter 31 (theft) the punishment level for which is a felony of the third degree or higher. TEX. CIV. REM. CODE § 41.008(c). Pursuant to Texas Penal Code § 31.04(3)(5), a felony is a third degree felony if the value of the property stolen is $20,000 or more.

[36] At the conclusion of the trial, the Plaintiffs withdrew their claim of common law fraud against Edelman.

Deposit Account, (2) his personal use of the DHLP funds deposited into the DDC Deposit Account, (3) his occupancy of Unit 2F without a valid lease pursuant to which he was paying rent, and (4) Diana's lack of a real estate license and her receipt of illegal commissions on the sale of DHLP's condominium units.

In Texas, fraud by nondisclosure occurs when: (1) a party conceals or fails to disclose a material fact within that party's knowledge, (2) the party had a duty to disclose the fact, (3) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, (4) the party intends to induce the other party to take some action by concealing or failing to disclose the fact, (5) the other party justifiably relied on the nondisclosure, and (6) the other party suffers injury as a result of acting without knowledge of the undisclosed fact. *Bradford v. Vento*, 48 S.W.3d 749, 755-56 (Tex. 2001); *BP America Prod. Co. v. Zaffirini*, 419 S.W.3d 485, 506 (Tex. App. -- San Antonio 2013). The burden to prove these elements by a preponderance of the evidence rests with the Plaintiffs. *Smith v. McDaniel*, 2013 WL 5302492, at * 6 (Tex. App. – Tyler 2013, no pet.) ("[P]roving common law fraud at trial for actual damages requires only proof by a preponderance of the evidence.")

As discussed below, the Court concludes that DHLP has met its burden to prove that Edelman committed fraud by nondisclosure with respect to Diana's lack of a real estate license and the commissions that Edelman directed be paid to her on the sale of Drexel Highlander condominium units. However, the Court also concludes that the Plaintiffs' remaining claims for fraud by nondisclosure fail.

Specifically, with regard to the Plaintiffs' claims that Edelman is liable for fraud by nondisclosure regarding (1) the wrongful transfer of $2,510,000 in DHLP funds to the DDC Deposit Account, (2) his personal use of the DHLP funds deposited into the DDC Deposit

Account, and (3) his occupancy of Unit 2F without a valid lease pursuant to which he was paying rent, the Court concludes that the Plaintiffs failed to carry their burden of proof with respect to at least the third element of a claim of fraud by nondisclosure – *i.e.*, that Edelman knew that Plaintiffs were ignorant of these facts and did not have an equal opportunity to discover the truth. While Edelman's knowledge of his acts are not imputed to DGP and DHLP because his actions were adverse to DGP and DHLP, see *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App. -- Houston [14th Dist.] 2008, pet. denied); *Askanase v. Fatjo,* 828 F.Supp. 465, 470 (S.D. Tex. 1993) (collecting cases), if Wiggins had an equal opportunity to discover the truth with respect to Edelman's actions, Wiggins knowledge would be imputed to DGP and DHLP. For the reasons explained below, the Court concludes that Wiggins had an equal opportunity to discover the truth about Edelman's actions.

The starting point in the Court's analysis is *Bradford v. Vento*, 48 S.W.3d 749 (Tex. 2001). *Bradford v. Vento* involved a fraud claim asserted by an individual, Vento, surrounding his purchase of a store from another individual, Taylor. *Id*. at 752–54. While Taylor owned the store, he signed successive short-term leases in the mall where the store was located. After purchasing the store from Taylor (or so he believed), Vento went to Bradford, the mall's property manager, to pay October rent, inform Bradford that he had purchased the store, and inquire about a long-term lease. *Id*. at 752. Bradford indicated that he had heard about the purchase and informed Vento that the monthly rent was a "decent deal," while suggesting a long-term lease would be a bad idea. Bradford then said that he would "take care of" Vento in January. *Id*. Bradford did not mention that the store's lease was nonassignable, that additional rent would be due in December, and that Vento would be required to apply for a new lease. *Id*. Taylor subsequently told Bradford that he still owned the store and that there could be "trouble."

*Id.* at 752–53. Bradford alerted mall security and Vento was asked to leave the mall because he could not prove that he owned the store. *Id.* at 753. Vento sued Bradford for, among other claims, fraud. *Id.*

The jury found for Vento on the fraud claim and the intermediate appellate court upheld that verdict. That court concluded that Bradford's "failure to disclose pertinent information regarding the procedures for obtaining a new lease constituted a partial disclosure which conveyed a false impression." *Id.* at 755. The false impression included that no rent increase would occur until January and that executing a new lease was a mere formality. *Id.* The Texas Supreme Court reversed, holding that there was no evidence that Bradford knew Vento was ignorant of a material fact or that Vento did not have an equal opportunity to discover the truth. Even though Vento claimed to have purchased the store, he never asked Bradford about the terms of the lease, for a copy of the lease, or about the rent for the rest of the year. *Id.* at 756. There was "no evidence that Bradford knew that Vento had not obtained or could not obtain the information from other sources, such as Taylor, from whom Vento was buying the store." *Id.* at 755–56.

Here, Wiggins testified that he demanded information regarding DHLP's operations, but that Edelman blocked his efforts. Wiggins's testimony was that Edelman did not allow open access to DHLP's books and records and, when Wiggins requested information, Edelman would give him various excuses, such as the financials were not in presentation form, there were expenses that needed to be reclassified, or that Edelman did not have time at the moment. According to Wiggins, if he pressed Edelman, Edelman would call in Caughey, who would show Wiggins current financial statements with Edelman present. The meeting would go on for an hour or so and then be cut off. When Wiggins would reach out to Caughey for more

information, Caughey would tell him that Edelman's instructions were to refer him to Edelman. Wiggins testified that, in the end, the information ultimately given to him was not extremely meaningful. Caughey similarly testified that this was what would happen during his earlier years of employment, but, beginning in 2010, Wiggins was given full access to the books and records.

Similar to the Texas Supreme Court's analysis in *Bradford v. Vento*, this Court's analysis will not focus upon what Edelman readily disclosed to Wiggins (and thus the other Plaintiffs), but whether Wiggins (and thus the other Plaintiffs) had an equal opportunity to discover the undisclosed facts. And, based upon the record before it, the Court finds that Wiggins, as a 50% member of DDC and the sole member of DGP (DHLP's general partner), had an equal opportunity to know all that was disclosed in DDC's, DGP's, and DHLP's respective books and records.

The DHLP Partnership Agreement states that:

> Accurate books, records and accounts shall be maintained by the General Partner [DGP] on behalf of the Partnership, showing its assets, liabilities, operations, transactions and financial condition. The Partnership books shall be maintained at the office of the General Partner. Each Partner shall have the right to inspect and copy the Partnership books at all reasonable times during regular business hours.

DHLP Partnership Agreement [Plaintiffs' Ex. 4] at ¶ 9.2 (Books and Records). The term "Partners" is defined to include DGP, of which Wiggins is the sole member.

Thus, the DHLP Partnership Agreement expressly gave DGP and, in turn, Wiggins, the right to demand access to, and copies of, all of DHLP's records. If Edelman refused to grant open access to DHLP's books and records, Wiggins, via DGP, had the legal right to demand such access be given and, if necessary, take additional steps to ensure that access was granted. That Wiggins chose not to exercise those legal rights until November 2010, when Edelman was removed from his various positions with the companies, does not equate to Wiggins not having

an equal opportunity to access the books and records and learn whatever information those records disclosed.

There is simply no evidence that Wiggins could not obtain access to DHLP's books and records and discover the bad acts at issue had he done more than merely ask Edelman.  And, while apparently cowed by Edelman's threats to leave when Wiggins pushed him for access to the records, Wiggins still had the legal right to obtain the information.  Accordingly, the Court finds that Wiggins (and thus the other Plaintiffs) had an equal opportunity to discover the truth and have failed to prove a claim of fraud by nondisclosure with respect to (1) the wrongful transfer of $2,510,000 in DHLP funds to the DDC Deposit Account, and (2) Edelman's occupancy of Unit 2F without a valid lease pursuant to which he was paying rent.

Similarly, the Plaintiffs have failed to prove a claim of fraud by nondisclosure regarding how DDC used the Disputed Draws.  Although access to DHLP's books and records would not have shown how DDC was spending DHLP's funds, the record shows that Wiggins held 50% of the membership interests in DDC, and, in that capacity, he had an equal opportunity to access DDC's books and records and discover how the funds were being used.  Regulations of Drexel Development Company, LLC [Plaintiffs' Ex. 147] at E-000464 (§9.2(B), Right of Inspection), E-000480 (Schedule A).  Accordingly, the Plaintiffs have similarly failed to prove a claim of fraud by nondisclosure related to DDC's use of the Disputed Draws, leaving only the claim of fraud by nondisclosure as it relates to Diana's lack of a real estate license and the related improper commissions paid to her, to which this Court now turns.

Although DDC's and/or DHLP's books and records would have disclosed to the Plaintiffs that Diana was receiving sales commissions, the record does not reflect that the Plaintiffs would have been able to ascertain from DHLP's or DDC's books and records that

Diana was not a licensed real estate broker or salesperson. Moreover, Wiggins testified that he had no idea that she was not a licensed broker or salesperson. Edelman did not refute that fact or show how the Plaintiffs could have discovered it. While Edelman's counsel argued that the Plaintiffs could have run a search on the internet to determine whether Diana was a licensed broker or salesperson, Edelman offered no evidence on this point, including how such a search would have been conducted or where such records were publically available to the Plaintiffs.

Accordingly, the Court finds that Edelman (1) failed to disclose the fact that Diana was not a licensed real estate broker or salesperson, (2) this fact was material, as only licensed brokers and salespersons are entitled to receive sales commissions under TRELA, (3) Edelman knew the Plaintiffs were unaware that Diana was not a licensed broker or salesperson and the Plaintiffs did not have an equal opportunity to discover this fact, (4) by not disclosing Diana's status, Edelman intended to induce the Plaintiffs to permit him to continue to pay substantial commissions to Diana related to the sales of condominium units at the Drexel Highlander, and (5) the Plaintiffs justifiably relied on this nondisclosure and took no actions to either remove Edelman from his position of authority or to prevent him from authorizing that illegal commissions be paid to Diana.

However, DGP and Wiggins have failed to allege or prove how either of them suffered any injury from Edelman's nondisclosures independent of that suffered by DHLP. Thus, DGP's and Wiggins's claims for fraud by nondisclosure fail. But, DHLP has proven damages to itself from Edelman's nondisclosures. Specifically, DHLP was damaged to the extent of the amount of commissions paid to Diana – *i.e.*, $462,604.50. However, because those damages are duplicative of the identical amount awarded to DHLP for Edelman's breach of fiduciary duty in relation to the commissions, DHLP may only receive a single recovery.

DHLP has also requested exemplary damages for Edelman's fraud by nondisclosure. As discussed in more detail in in Section III.B.2.b)(4), above, Chapter 41 of the Texas Civil Practices and Remedies Code permits the Court to award exemplary damages when clear and convincing evidence shows that the harm with respect to which the claimant seeks recovery of exemplary damages results from malice, fraud,[37] or gross negligence. TEX. CIV. PRAC. REM. CODE § 41.003(a).

Here, the Plaintiffs have shown, by clear and convincing evidence, that Edelman committed fraud by nondisclosure with respect to the illegal commissions he directed be paid to Diana. DHLP's actual damages were $462,604.50, for which this Court will award exemplary damages of $250,000. However, because the $250,000 of exemplary damages being awarded to DHLP for Edelman's fraud by nondisclosure is duplicative of the identical amount of exemplary damages being awarded to DHLP for Edelman's breach of fiduciary duty related to the illegal commissions, the Court concludes that DHLP may only receive a single recovery of these damages.

### E. Summary of Amounts to be Awarded

In summary, and as found above, the amounts to be awarded by the Court pursuant to a separate Judgment are as follows:

- $302,400 in favor of DHLP for Edelman's trespass onto Unit 2F. Of this amount, $37,800 is the result of actions taken by Edelman in bad faith, with malice, and with specific intent to cause substantial harm or injury.[38]

- $75,000 in exemplary damages in favor of DHLP for Edelman's trespass onto Unit 2F.

---

[37] "Fraud" means fraud other than constructive fraud. *Id.* at § 41.001(6).

[38] The Court notes that the $302,400 awarded to DHLP for Edelman's trespass onto Unit 2F is duplicative of the same amount awarded to DHLP for Edelman's breaches of fiduciary duties to DHLP based upon his occupancy of Unit 2F for 56 months, rent free. DHLP may only receive a single recovery.

- $302,400 in favor of DHLP for Edelman's breaches of the fiduciary duties of loyalty and care owed to DHLP in occupying Unit 2F of the Drexel Highlander for 56 months without paying any rent.

- $150,000 in exemplary damages in favor of DHLP for Edelman's breaches of the fiduciary duties of loyalty and care owed to DHLP related to his 56 month occupancy of Unit 2F without paying rent.[39]

- $462,604.50 in favor of DHLP for Edelman's breaches of the fiduciary duties of loyalty and care owed to DHLP in authorizing and directing that illegal commissions on the sales of condominium units at the Drexel Highlander be paid to Diana.

- $250,000 in exemplary damages in favor of DHLP for Edelman's breaches of the fiduciary duties of loyalty and care owed to DHLP related to his authorizing and directing that illegal commissions on the sales of condominium units at the Drexel Highlander be paid to Diana.

- $2,475,605.65 in favor of DHLP for Edelman's breaches of the fiduciary duties of loyalty and care owed to DHLP in authorizing and directing that the Disputed Draws be made and the resulting funds deposited into the DDC Deposit Account, or, alternatively, in directing DHLP to loan the Disputed Draws to DDC with the knowledge that DDC could not repay the loans.

- $1,000,000 in exemplary damages in favor of DHLP for Edelman's breaches of the fiduciary duties of loyalty and care owed to DHLP in his handling of the Disputed Draws.

- $2,475,605.65, plus $1,000 in statutory damages, in favor of DHLP for Edelman's violation of the TTLA.[40]

- $1,000,000 in exemplary damages in favor of DHLP for Edelman's violation of the TTLA.[41]

- $462,604.50 in favor of DHLP for Edelman's fraud by nondisclosure related to the illegal commissions on the sales of condominium units at the Drexel Highlander that he directed be paid to Diana.[42]

---

[39] The Court notes that $75,000 of this amount is duplicative of the exemplary damages being awarded to DHLP for Edelman's trespass, for which DHLP is only entitled to a single recovery.

[40] The Court notes that the $2,745,605 awarded to DHLP for Edelman's violation of the TTLA is duplicative of the identical amount awarded to DHLP for Edelman's breaches of fiduciary duty, and that DHLP may only receive a single recovery.

[41] The Court notes that the $1,000,000 of exemplary damages awarded to DHLP for Edelman's violation of the TTLA is duplicative of the identical amount awarded to DHLP as exemplary damages for Edelman's breaches of fiduciary duties with respect to the Disputed Draws, and that DHLP may only receive a single recovery.

- $250,000 in exemplary damages in favor of DHLP for Edelman's fraud by nondisclosure related to the illegal commissions on the sales of condominium units at the Drexel Highlander that he directed be paid to Diana.[43]

- DGP and Wiggins have each failed to carry their respective burdens of proof on the claims alleged, and each shall take nothing.

The Court must now determine to what extent these amounts, if any, are dischargeable by Edelman in his bankruptcy case.

### F.    The Section 523 Claims

As a predicate legal matter, the Court notes that exceptions to discharge should be construed in favor of the debtor. *Fezler v. Davis (In re Davis)*, 194 F.3d 570, 573 (5th Cir. 1999). The creditor bears the burden of proving by a preponderance of the evidence that a debt should not be discharged under § 523(a). *See Grogan v. Garner*, 111 S. Ct. 654, 661 (1991); *In re Acosta,* 406 F.3d 367, 372 (5th Cir. 2005).

### 1.    Section 523(a)(2) – False Pretenses, False Representations, or Actual Fraud

Section 523(a)(2) provides that "a discharge under section 727 ... does not discharge an individual debtor from any debt … for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by: (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition...." 11 U.S.C. § 523(a)(2)(A). Although the general purpose of the Bankruptcy Code is to provide debtors with a fresh start, "section 523(a)(2)(A) is not designed to protect debtors; rather it is designed to protect the victims of fraud." *In re Arnette,* 454 B.R. at 698 (quoting *In re*

---

[42] The Court notes that the $462,604.50 awarded to DHLP for Edelman's fraud by nondisclosure is duplicative of the identical amount awarded to DHLP for Edelman's breach of fiduciary duty with respect to the illegal commissions paid to Diana, and that DHLP may only receive a single recovery.

[43] The Court notes that the $250,000 of exemplary damages awarded to DHLP for Edelman's fraud by nondisclosure related to the illegal commissions he directed be paid to Diana is duplicative of the identical amount awarded to DHLP as exemplary damages for Edelman's breaches of fiduciary duties with respect to the illegal commissions he directed be paid to Diana, and that DHLP may only receive a single recovery.

**MEMORANDUM OPINION**                                                                     **69**

*Quinlivan*, 434 F.3d 314, 319 (5th Cir. 2005)). "Despite the more general purpose of the bankruptcy code, which is to give debtors a fresh start, section 523(a)(2)(A) captures a competing principle." *Id.* (quoting *Quinlivan*, 434 F.3d at 319). "Congress intended § 523(a)(2)(A) to protect victims of fraud over the defrauding debtor." *Id.* (citing *Cohen v. de la Cruz*, 118 S. Ct. 1212, 1218 (1998)).

The Fifth Circuit has stated, without distinguishing between the different torts encompassed by § 523(a)(2)(A), that for a debt to be non-dischargeable under that section, the creditor must show that (1) the debtor made a representation, (2) the debtor knew the representation was false, (3) the debtor made the representation with the intention to deceive the creditor, (4) that the creditor actually and justifiably relied on such representations, and (5) that the creditor sustained losses as a proximate result of its reliance. *In re Acosta*, 406 F.3d at 372; *RecoverEdge, L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995); *In re Arnette*, 454 B.R. at 698. False representations need not be overt. *In re Arnette*, 454 B.R. at 698. "When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation." *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001).

As discussed in Section III.D, above, Edelman committed fraud by nondisclosure. In this regard, DHLP has proven by a preponderance of the evidence that (1) Edelman, its fiduciary with a duty to speak, failed to disclose to it the fact that Diana was not a licensed real estate broker or salesperson, (2) this fact was material, as only licensed brokers and salespersons are entitled to receive sales commissions under TRELA, (3) Edelman knew that DHLP was unaware that Diana was not a licensed broker or salesperson, (4) by not disclosing Diana's status, Edelman intended to induce DHLP to permit him to continue to pay substantial commissions to Diana related to the sale of condominium units at the Drexel Highlander, (5) DHLP actually and

justifiably relied on this nondisclosure and took no actions to either remove Edelman from his position of authority or prevent him from authorizing that commissions be paid to Diana, and (6) DHLP suffered $462,604.50 in damages as the proximate result of Edelman's actions, as that is the amount of commissions Edelman caused to be paid to Diana from 2008 through 2010. Accordingly, these damages are excepted from Edelman's discharge under 11 U.S.C. § 523(a)(2)(A).

### 2. Section 523(a)(4) – Fraud or Defalcation in a Fiduciary Capacity, Embezzlement, or Larceny

"A discharge under section 727 ... does not discharge an individual debtor from any debt … for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Section 523(a)(4) is intended to address situations (1) where "debts [are] incurred through abuses of fiduciary positions," and (2) where debts are incurred "through active misconduct whereby a debtor has deprived others of their property by criminal acts." *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998) (citing *In re Boyle,* 819 F.2d 583, 588 (5th Cir. 1987).

The concept of fiduciary under § 523(a)(4) "is narrowly defined." *In re Bennett*, 989 F.2d at 784 (citing *Angelle v. Reed (In re Angelle),* 610 F.2d 1335 (5th Cir. 1980)). It applies only to technical or express trusts, and not to constructive trusts. *Id.* Further, the trust giving rise to the fiduciary relationship must exist prior to the act creating the debt, *i.e.* the debtor must have been a trustee prior to his or her wrongdoing. *Id.* However, the "technical" or "express" trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to state or common law. *Id.* at 784–85. Thus, the Court must first look to state law in order to determine what obligations are imposed on the debtor with respect to the relationship at issue, and then decide whether the

obligations imposed under state law are sufficient to meet the federal law requirements of "fiduciary capacity" under § 523(a)(4). *See id.* ("The scope of the concept of fiduciary under 11 U.S.C. § 523(a)(4) is a question of federal law; however, state law is important in determining whether or not a trust obligation exists.").

Until recently, a defalcation under § 523(a)(4) in this circuit required the establishment of a "willful neglect of duty" that was "essentially a recklessness standard." *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 185 (5th Cir. 1997). Willfulness in that context had been "measured objectively by reference to what a reasonable person in the debtor's position knew or reasonably should have known." *Harwood*, 637 F.3d at 624 (citing *Office of Thrift Supervision v. Felt (In re Felt)*, 255 F.3d 220, 226 (5th Cir. 2001)). However, the United States Supreme Court has recently rejected an objective recklessness standard in favor of a heightened culpability standard for defalcation in this context. In a unanimous decision in *Bullock v. BankChampaign, N.A.,* 133 S. Ct. 1754 (2013), the Supreme Court held that the term "defalcation" as used in § 523(a)(4) "includes a culpable state of mind requirement," which involves the "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Id.* at 1757.

The Supreme Court explained:

> [W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent.

*Id*. at 1759. This includes reckless conduct of the kind set forth in the Model Penal Code § 2.02(2)(c),[44] which the Supreme Court favorably compared to the "severe recklessness"

---

[44] Model Penal Code § 2.02(2)(c) states that:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from

standard used in securities fraud cases. *Id.* (citing *Ernst & Ernst v. Hochfelde*r, 96 S. Ct. 1375, 1981 n.12 (1976)). Thus, there may be a defalcation "if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.* at 1759. That "risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.* at 1760 (citation omitted).

Here, the trial record established that, from April 20, 2006 through mid-November 2010, Edelman exercised complete control over the day-to-day management of DHLP. Under Fifth Circuit precedent, the type of control exercised by Edelman is sufficient to give rise to a fiduciary relationship with DHLP, regardless of whether Edelman was an officer or director of DHLP itself. *See* § B.2.a), *supra.*

In applying the heightened *Bullock* standard to the facts of this case, the record establishes by a preponderance of the evidence that Edelman's conduct resulted in multiple defalcations while he was acting in a fiduciary capacity to DHLP. Specifically, the Court concludes that the $302,400 awarded to DHLP arising from Edelman's breaches of the fiduciary duties of loyalty and care he owed to DHLP related to his occupancy of Unit 2F for 56 months without paying rent is excepted from discharge as a debt for a defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4). Edelman's occupancy of Unit 2F under the circumstances of this case constitutes an intentional wrong or, at the very least, represents actions taken by Edelman in conscious disregard of (or willful blindness to) a substantial and

---

his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

Model Penal Code § 2.02(2)(c) (Thomson Reuters, Westlaw through 2013).

**MEMORANDUM OPINION**                                                                     73

unjustifiable risk that his occupancy of Unit 2F without paying rent would violate his fiduciary duties owed to DHLP, the owner of the property.

The Court further concludes that the $2,475,605.65 awarded to DHLP arising from Edelman authorizing and directing that the Disputed Draws be made and deposited into the DDC Deposit Account in contravention of the DHLP Partnership Agreement, the Commercial Loan Agreement, and the Development Agreement is excepted from discharge as a debt for a defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4). Edelman's actions regarding the Disputed Draws were an intentional wrong or, at the very least, represent actions taken by Edelman in conscious disregard of (or wilful blindness to) a substantial and unjustifiable risk that his conduct would violate his fiduciary duties owed to DHLP, particularly since he was unable to show that the funds were used to pay DHLP's legitimate business expenses. In the alternative, should the damages resulting from Edelman's breach of fiduciary duty in this regard be measured by the benefit to Edelman, versus the injury to DHLP, the Court finds that its award of $880,951.96 is excepted from discharge as a debt for a defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4).

The record also establishes by a preponderance of the evidence that Edelman's actions resulted in him committing fraud by nondisclosure upon DHLP, an entity to which he owed a fiduciary duty. Accordingly, the Court further concludes that the $462,604.50 awarded to DHLP for Edelman's fraud by nondisclosure is excepted from Edelman's discharge as a debt arising from fraud under 11 U.S.C. § 523(a)(4).

Finally, the record establishes by a preponderance of the evidence that Edelman's actions resulted in a violation of the TTLA. Accordingly, the Court further concludes that the $2,475,605.65 awarded to DHLP arising from Edelman's violation of the TTLA is excepted

from Edelman's discharge under 11 U.S.C. § 523(a)(4).  *In re Sherali*, 490 B.R. at 124 ("A finding of violation of a civil theft statute satisfies the requirements for nondischargeability under 11 U.S.C. § 523(a)(4).").

### 3.      Section 523(a)(6) – Willful and Malicious Injury

Section 523(a)(6) precludes the discharge of debt incurred "for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6). An injury under § 523(a)(6) is willful and malicious where either (1) there is an objective substantial certainty of harm, or (2) there exists a subjective motive to cause harm.  *In re Arnette*, 454 B.R. at 700 (citing *In re Miller*, 156 F.3d 598, 604-06 (5th Cir. 1998)).  "Injuries covered by section 523(a)(6) are not limited to physical damage or destruction; harm to personal or property rights is also covered by section 523(a)(6)."  *Id.* (quoting *In re Beveridge,* 416 B.R. 552, 571 (Bankr. N.D. Tex. 2009)).

The Court concludes that the $302,400 awarded to DHLP arising from Edelman's breaches of the fiduciary duties of loyalty and care he owed to DHLP through his occupancy of Unit 2F for 56 months without paying rent is excepted from Edelman's discharge under 11 U.S.C. § 523(a)(6).  From an objective standpoint, a reasonable person would conclude that Edelman's prolonged occupancy of Unit 2F and failure to pay any rent was substantially certain to result in injury to DHLP, the owner of the property.  Further, the record establishes that Edelman engaged in this rent-free occupancy knowingly, intentionally, and with a subjective motive to cause harm.

The Court further concludes that the $2,475,605.65 awarded to DHLP arising from Edelman's breaches of the fiduciary duties of loyalty and care he owed to DHLP by authorizing and directing that the Disputed Draws be made and the resulting funds deposited into the DDC Deposit Account are excepted from Edelman's discharge under 11 U.S.C. § 523(a)(6).  From an

objective standpoint, a reasonable person would conclude that directing DDC to improperly draw $2,510,000 under the Commercial Loan Agreement, depositing those funds into the DDC Deposit Account, and then not using those funds to pay DHLP's legitimate operating expenses was substantially certain to result in injury to DHLP, particularly when DHLP was the party liable to repay to Valliance the funds drawn under the Commercial Loan Agreement.  Further, the record establishes that Edelman directed the improper draws and deposits of resulting funds into the DDC Deposit Account knowingly, intentionally, and with a subjective motive to cause harm.  In the alternative, should the damages resulting from Edelman's breach of fiduciary duty in this regard be measured by the benefit to Edelman, versus the injury to DHLP, the Court finds that its award of $880,951.96 is excepted from Edelman's discharge as a debt for a willful and malicious injury under 11 U.S.C. § 523(a)(6).

The Court further concludes that the $2,475,605.65 awarded to DHLP arising from Edelman's violation of the TTLA are excepted from Edelman's discharge under 11 U.S.C. § 523(a)(6).  From an objective standpoint, a reasonable person would conclude that unlawfully appropriating $2,475,605.65 in DHLP's funds was substantially certain to result in injury to DHLP.  Further, the record establishes that Edelman directed the unlawful appropriation intentionally and with a subjective motive to cause harm.

### 4.      Nondischargeability of Exemplary Damages, Statutory Damages, and Attorneys' Fees

When the primary debt is nondischargeable due to fraud or defalcation while acting in a fiduciary capacity, or as a result of willful and malicious conduct, the related ancillary awards (such as attorneys' fees, interest, and exemplary damages) will also be nondischargeable.  *See Cohen v. de la Cruz,* 523 U.S. 213, 215 (1998) ("§ 523(a)(2)(A) prevents the discharge of all liability arising from fraud, and that an award of treble damages therefore falls within the scope

of the exception."); *Gober v. Terra Corp. (In re Gober),* 100 F.3d 1195, 1208 (5th Cir. 1996) ("When the primary debt is nondischargeable due to willful and malicious conduct, the attorney's fees and interest accompanying compensatory damages, including post-judgment interest, are likewise nondischargeable."); *In re Woomer*, 2013 WL 5536072, at *18 (Bankr. E.D. Tex. Oct. 7, 2013 2013) (slip op.) (holding attorneys' fees related to a debt nondischargeable under § 523(a)(4) as a defalcation in a fiduciary capacity also nondischargeable).

Applying this precedent, the Court concludes that any attorneys' fees awarded following the bifurcated hearing, the $1,000 in statutory damages awarded to DHLP under the TTLA, and the exemplary damages awarded to DHLP are non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and/or (a)(6), as applicable.

## IV.    CONCLUSION

For the reasons explained herein, DGP and Wiggins take nothing by their Amended Complaint.  DHLP, however, is entitled to a judgment in its favor on the following claims and in the following amounts, to the extent not duplicative of each other, as DHLP is entitled to only a single recovery: (1) trespass with actual damages of $302,400 and exemplary damages of $75,000; (2) breach of fiduciary duty for (i) occupying Unit 2F for 56 months, rent free, with actual damages of $302,400 and exemplary damages of $150,000, (ii) for causing illegal commissions to be paid to Diana on the sale of Drexel Highlander condominium units with actual damages of $462,604.50 and exemplary damages of $250,000, and (iii) actions related to his handling of the Disputed Draws with actual damages of $2,475,605.65 and exemplary damages of $1,000,000; (3) violation of the TTLA with actual damages of $2,475,605.65,

statutory damages of $1,000, and exemplary damages of $1,000,000; and (4) fraud by nondisclosure with actual damages of $462,604.50 and exemplary damages of $250,000.

A judgment in DHLP's favor will be entered separately, following the hearing on attorneys' fees that the parties agreed to have following the issuance of this Memorandum Opinion. All amounts awarded to DHLP in that judgment are excepted from Edelman's discharge under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and/or (a)(6), as applicable.

### # # # END OF MEMORANDUM OPINION # # #